## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

**DIONTE COLEY**
   1355 New York Avenue, NE
   Washington, DC 20002

         *Plaintiff,*

v.

**MURIAL BOWSER**
   *in her individual capacity and*
   *in her official capacity as*
   *Mayor of the District of Columbia*

   1350 Pennsylvania Avenue, NW
   Washington, DC 20004,

**PETER NEWSHAM**
   *in his individual capacity and*
   *in his official capacity as*
   *Chief of Police,*
   *Metropolitan Police Department*

   300 Indiana Avenue, NW,
   Room 5059
   Washington, DC 20001,

**KARL RACINE**
   *in his individual capacity and*
   *in his official capacity as*
   *Attorney General of the*
   *District of Columbia*

   441 4th Street, NW
   Washington, DC 20001,

**CHRISTOPHER GELDART**
   *in his individual capacity and*
   *in his official capacity as*
   *Acting Director of the Department*
   *of DPW*

</td><td>

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

</td><td>

**COMPLAINT**

Civil Action No.:


Case: 1:20−cv−02182    JURY DEMAND
Assigned To : Unassigned
Assign. Date : 8/11/2020
Description: Other Civil Rights (L−DECK)

</td></tr>
</table>

**RECEIVED**

AUG 11 2020

Clerk, U.S. District & Bankruptcy
Court for the District of Columbia

2000 14th Street, NW                    )
Washington, DC 20009,                   )
                                        )
**LAQUANDRA NESBITT**                   )
    *in her individual capacity and*    )
    *in her official capacity as*        )
    *Director of District of Columbia*   )
    *Department of Health*              )
                                        )
899 North Capitol Street, NE            )
Washington, DC 20002,                   )
                                        )
**WAYNE TURNAGE**                       )
    *in his individual capacity and*    )
    *in his official capacity as*        )
    *Deputy Mayor for the District of*   )
    *Columbia Health and*               )
    *Human Services*                    )
                                        )
441 4th Street, NW, 900S                )
Washington, DC 20001,                   )
                                        )
**FOUR UNIDENTIFIED**                   )
**METROPOLITAN POLICE OFFICERS**        )
    *in their individual capacity and*  )
    *in their official capacity*        )
                                        )
C/o: Chief Peter Newsham                )
300 Indiana Avenue, NW,                 )
Room 5059                               )
Washington, DC 20001,                   )
                                        )
**AT LEAST THREE UNIDENTIFIED**         )
**DEPARTMENT OF PUBLIC WORK**           )
**EMPLOYEES**                           )
    *in their individual capacity and*  )
    *in their official capacity*        )
                                        )
C/o: Christopher Geldart                )
2000 14th Street, NW                     )
Washington, DC 20009,                   )
                                        )
        *Defendants.*               )

## COMPLAINT FOR DAMAGES

1.      This is a civil action seeking monetary damages brought under 42 U.S.C. § 1983 and § 1988 alleging violations of Plaintiff's constitutional rights under the Fourth and Fifth Amendments to the U.S. Constitution and various tort claims[1] against Defendants as authorized by D.C. Code §§ 2-401 et. seq.

## JURISDICTION AND VENUE

2.      This Court has original jurisdiction for a civil action asserting a deprivation of rights pursuant to 28 U.S.C. § 1331 (federal question).  This Court has supplemental jurisdiction over Plaintiff's tort claims as those claims form a part of the same case or controversy pursuant to 28 U.S.C. § 1367(a) (supplemental jurisdiction).

3.      This Court is the proper venue pursuant to 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to this action occurred in the District of Columbia and all Defendants are officials or employees of the District of Columbia.

## PRELIMINARY STATEMENT

4.      Mr. Coley ("Plaintiff") is a cook.  After the coronavirus pandemic struck and the Mayor issued orders closing all kitchens and restaurants, Mr. Coley sought shelter with his family in North Carolina.  Once Mayor Bowser issued orders for the reopening of kitchens in the District, Mr. Coley decided to return home, because he thought he would be able to find temporary work.  On June 22, 2020, Mr. Coley took the Megabus back from Durham, N.C., to Union Station, Washington, D.C.

---

[1] Notice was received by Defendant Bowser pursuant to D.C. Code § 12-309 on July 24, 2020.

5.      Mr. Coley traveled light.  His black backpack adorned with a comic book character's logo contained everything that he needed: a cell phone with all of his personal contacts and photos; three sets of clothes; toiletries; his social security card; his birth certificate; his financial documents and certifications; $800 to use for rent; and the key to his locker, where he temporarily stored the rest of his possessions.

6.      Unbeknownst to Mr. Coley, on June 22, 2020, BLM protestors had attempted to pull down the President Andrew Jackson statue in Lafayette Square and to found the Black House Autonomous Zone in Black Lives Matter Plaza.  These actions exacerbated tensions brewing between the White House and the Mayor Bowser's administration over the right of President Trump to seize the D.C. police force under Section 740 of the 1973 Home Rule Act, which the Bowser administration equated to tantamount to a government overthrow.

7.      Under this existential threat by the White House, the Bowser administration organized an emergency encampment removal of all protestors from Black Lives Matter Plaza on June 23, 2020, in the morning.

8.      On June 23, 2020, at approximately 3:00pm, Mr. Coley stood near the southwest corner of 16th Street, NW, and K Street, NW, next to Black Lives Matter Plaza, and waited for the bus to take him back to his home in Northeast Washington.

9.      Suddenly and without notice, hundreds of District Metropolitan Police Officers descended upon the area, shouting and shoving, "MOVE" and "GET BACK." Two police officers shoved Mr. Coley back and separated him from his backpack.

10.      MPD officers cornered Mr. Coley and others, some of whom might have been protestors, against the wall of a building on the southwest intersection of 16th Street

and K Street NW and restrained them there.  Mr. Coley watched as police officers moved his backpack into the middle of the intersection of K Street and 16th Street, along with other people's property: tents, bags, and other personal items.  Police officers lined up abreast to square off the intersection and to prevent anyone from getting past them.

11.     Mr. Coley desperately tried to explain to one officer after another that he needed his backpack and that his backpack was important.  Not one officer offered to help him, which left him frustrated, dejected, and demoralized.

12.     The MPD officers allowed an orange garbage truck operated by employees from the D.C. Department of Public Works ("DPW") into the intersection. The DPW employees and some MPD officers threw all of the items, including Mr. Coley's backpack into the garbage receptacle of the trash truck.  As the trash truck drove off Mr. Coley screamed that he needed his backpack.

13.     An MPD officer told Mr. Coley to "Forget the F******g bag, it's F******g gone.  You're not getting it back."  Neither the MPD, the DPW employees, or any other government official gave immediate notice of their intended action or provided an opportunity for appeal prior to or following the forcible seizure of the individuals' property, and certainly not before the property was disposed of and destroyed.

14.     Finally, when the MPD permitted Mr. Coley to leave the area, he tried to find a place to stay for the night.

15.     The actions of the MPD and the DPW employees forced Mr. Coley into homelessness.  He could not pay for housing, because he no longer had the $800 he had saved for the room he negotiated to rent.

16.     Mr. Coley now resides at the New York Avenue Low Barrier Men's Shelter run by Catholic Charities during the continued coronavirus pandemic.  He cannot get a job with his previous employer, because he no longer possesses his social security card or birth certificate.  He cannot call his friends and family for help or to just tell them he is all right, because his cell phone has been taken from him.  Mr. Coley cannot even get his other possessions, because his storage locker key is gone.  By the end of June 23, 2020, Mr. Coley had approximately $230 to his name.  As of the date of filing, Mr. Coley has no more money.

17.     Mr. Coley brings this lawsuit to recover damages resulting from a violation of his Fourth and Fifth Amendment rights as well as various tort theories of liability, i.e., intentional infliction of emotional distress, conspiracy, and conversion.  He seeks declaratory relief and monetary damages.

## PARTIES

**Plaintiff**

18.     Plaintiff Dionte Coley is a native Washingtonian who resides at the New York Avenue, Low Barrier Shelter, 1355 New York Avenue, NE, Washington, DC 20002.

**Defendants**

19.     Defendant Muriel Bowser is the Mayor of the District of Columbia.  She has been named as a defendant in both her official and individual capacity.  As Mayor, Defendant Bowser directs all of the District's agencies, including the Metropolitan Police Department; the Office of the Attorney General; the Department of Public Works; the Department of Health; and the Office of the Deputy Mayor for Health and Human

Services.  Defendant Bowser is also responsible for the District's administration of its laws and policies.

20.     Defendant Peter Newsham is the Chief of the Metropolitan Police Department ("MPD").  He has been named as a defendant in both his official and individual capacity.  As Chief of Police, Defendant Newsham is responsible and accountable for all operations of the MPD.  He directs policies, procedures, and rules of engagement for the MPD.

21.     Defendant Karl Racine is the Attorney General for the District of Columbia.  He has been named as a defendant in both his official and individual capacity. As Attorney General, Defendant Racine is responsible for enforcing the laws of the District, providing legal advice to the Mayor and other District government agencies, and protecting the interests of the District's citizens.

22.     Defendant Christopher Geldart is the Acting Director of the D.C. Department of Public Works.  He has been named as a defendant in both his official and individual capacity.  As the Acting Director of DPW, Defendant Geldart oversees DPW employees and is responsible for the disposition of waste in the District, including the maintenance of the District's streets and public spaces as well as the operation of the District's trash trucks.

23.     Defendant LaQuandra Nesbitt is a medical doctor and the Director of the D.C.  Department of Health ("DC Health").  She has been named as a defendant in both her official and individual capacity.  As the Director of DC Health, Defendant Nesbitt oversees employees of DC Health and is responsible for identifying health risks, preventing and controlling disease, and other health-related endeavors.

24.     Defendant Wayne Turnage is the Deputy Mayor for D.C.  Health and Human Services ("HHS").  He has been named as a defendant in both his official and individual capacity.  As Deputy Mayor for HHS, Defendant Turnage oversees HHS employees and is responsible for the removal of encampments in the District.

25.     Defendants "four unidentified police officers" are officers from the MPD. They are named as defendants in both their official and individual capacity.  Plaintiff will attempt to identify the officers by examining pictures of all officers located at the intersection of 16th Street NW and K Street NW, at approximately 3:00pm on June 23, 2020.  Defendant officers swore an oath to protect District citizen's rights with a focus on service, integrity, and fairness by upholding the District's motto *Justitia Omnibus* – Justice for All.

26.     Defendants "at least three Department of DPW employees" are believed to be employees of the DPW.  They are named as defendants in both their official and individual capacity.  These defendants may be identified by their assignment to the trash truck that removed personal property located at the intersection of 16th Street NW and K Street NW, at approximately 3:00pm on June 23, 2020.

**STATEMENT OF FACTS**

**The Killing of George Floyd and Subsequent Mass Protests in D.C. Created a Political Crisis for President Trump, Because It Appears to Show a City and Country Out of Control.**

27.     On May 25, 2020, George Floyd, a black man, was killed by a white Minneapolis Police Officer.  Mr. Floyd's death triggered global protests against racial injustice.  *See e.g.*, Susan E. Rice, *Op-Ed: Take the Next Step Toward Racial Justice*, N.Y. Times, July 21, 2020.

28.    For several nights after George Floyd's death, clashes between protestors and federal and local law enforcement erupted in the District.  *See* Joyce Koh and Jorge Ribas, *A tense standoff at the White House: Protests grip D.C. for a second night*, Wash. Post, Video, May 30, 2020.

29.    Historically the District has proudly become a rallying point for protests, because the District represents the seat of Federal power as personified in its cherished institutions, like the Capitol, the Supreme Court, and the White House.  Following the death of George Floyd one of the main areas in which protestors congregated was Lafayette Square, a park selected because of its location immediately across the street from the White House.  On May 31st, protestors set ablaze a part of St. John's Church at the edge of the Square.

30.    With displays of protests occurring across the country, "The President— furious about criticism that he had not done enough to stop the protests and violence that followed the death of George Floyd in Minneapolis—told senior advisors Monday, [June 1, 2020], that they had to show they could control the streets of Washington and the area around the White House, according to two people familiar with his comments who, like others, spoke on the condition of anonymity to describe private conversations.  If they did not it would send a bad signal to the rest of the country, and they would look weak, he said.  'You can't have a burning church in front of the White House was the President's message,' one persons said."  Carol D. Leonnig, Matt Zapotosky, Josh Dawsey, and Rebecca Tan, *Barr personally ordered removal of protestors near White House, leading to use of force against largely peaceful crowd*, Wash. Post, June 2, 2020.

31.     On June 1st, at 6:43pm, President Trump gave the following remarks from

the Rose Garden,

> I am taking immediate presidential action to stop the
> violence and restore security and safety in America.  I am
> mobilizing all available federal resources — civilian and
> military — to stop the rioting and looting, to end the
> destruction and arson, and to protect the rights of law-
> abiding Americans, including your Second Amendment
> rights.  Therefore, the following measures are going into
> effect immediately:
>
> First, we are ending the riots and lawlessness that
> has spread throughout our country.  We will end it now.
> Today, I have strongly recommended to every governor to
> deploy the National Guard in sufficient numbers that we
> dominate the streets.  Mayors and governors must establish
> an overwhelming law enforcement presence until the
> violence has been quelled.
>
> If a city or a state refuses to take the actions that are
> necessary to defend the life and property of their residents,
> then I will deploy the United States military and quickly
> solve the problem for them.
>
> I am also taking swift and decisive action to protect
> our great capital, Washington, D.C.  What happened in this
> city last night was a total disgrace.  As we speak, I am
> dispatching thousands and thousands of heavily armed
> soldiers, military personnel, and law enforcement officers
> to stop the rioting, looting, vandalism, assaults, and the
> wanton destruction of property.
>
> We are putting everybody on warning: Our seven
> o'clock curfew will be strictly enforced.   Those who
> threaten innocent life and property will be arrested,
> detained, and prosecuted to the fullest extent of the law.
>
> I want the organizers of this terror to be on notice
> that you will face severe criminal penalties and lengthy
> sentences in jail.

President Donald J.  Trump, Remarks at the Rose Garden (June 1, 2020) *available at*

https://www.whitehouse.gov/briefings-statements/statement-by-the-president-39/.

32.     Moments later one of the most symbolically distressing events in recent U.S. history occurred.  Federal and state police officers forcefully attacked predominantly peaceful protestors with smoke canisters, pepper balls, riot shields, and batons for a Presidential photo-op outside St. John's Church.  The scene was reminiscent of the 1963 Birmingham civil rights protest where police unleashed vicious dogs on protestors and assaulted them with fire-hoses.



33.     That night, Mayor Bowser tweeted, "I imposed a curfew at 7pm.  A full 25 minutes before the curfew & w/o provocation, federal police used munitions on peaceful protestors in front of the White House, an act that will make the job of @DCPoliceDept officers more difficult.  Shameful!  DC Residents – Go Home.  Be Safe."

**The President of the United States May Seize Control of D.C.'s Metropolitan Police Department under the 1973 Home Rule Act.**

34.    The 1973 Home Rule Act delegated limited legislative authority to the

District to govern its own affairs.  Importantly, Section 740 allows the President of the

United States to take emergency control of the police.

> Notwithstanding any other provision of law, whenever the
> President of the United States determines that special
> conditions of an emergency nature exist which require the
> use of the Metropolitan Police force for Federal purposes,
> he may direct the Mayor to provide him, and the Mayor
> shall provide, such services of the Metropolitan Police
> force as the President may deem necessary and appropriate.

D.C. Code § 1-207.40 (2020).[2]

**To Change the Narrative and Optics of Massive Civil Unrest in the
District, the Trump Administration Wanted a Significant Show of
Force Against Protestors and Began to Assert Its Right to Take
Control of the MPD.**

35.    The next day, District officials reported that the White House had pushed

to take control of the MPD.  "The unprecedented request sent District leaders scrambling

to head off what they regarded as **tantamount to a government overthrow**, and to the

legal books to come up with a way to push back."  Peter Hermann, Fenit Nirappil, and

Josh Dawsey, *Trump Administration considered taking control of D.C. police force to*

*quell protests*, Wash. Post (June 2, 2020) (emphasis added); *see* Muriel Bowser, News

Conference on Protests and Civil Unrest (June 2, 2020).

---

[2] 1.    There is disagreement between the Bowser and the Trump administrations as to
whether President Trump may take emergency control of the police.  However, legal
scholars opine that the threat to do so is real.  See Peter Hermann, Fenit Nirappil, and
Josh Dawsey, Trump administration considered taking control of D.C. police force to
quell protests, Wash. Post (June 2, 2020) (GW Law Professor Jonathan Turley said the
provision "gives the federal government wide latitude in defining and 'emergency,' while
"D.C. Attorney General Karl Racine said he believes the term 'emergency' would be
interpreted narrowly and would mean the city had fallen into a 'state of lawlessness that
would require an extraordinary' supplemental force.").

36.    By that Friday, June 5th, Mayor Bowser ordered employees from DPW to paint "Black Lives Matter" on 16th Street NW, between K and H Streets in a move designed to escalated the tensions between the District and the White House.  Rebecca Shabad and Dartunorro Clark, *D.C.  Mayor Bowser has 'Black Lives Matter' painted on street leading to White House*, NBC News (June 5, 2020) *available at* https://www.nbcnews.com/politics/politics-news/d-c-mayor-bowser-has-black-lives-matter-painted-street-n1225746.



37.    That afternoon, President Trump tweeted, "The incompetent Mayor of Washington, D.C., @MayorBowser, who's budget is totally out of control and is constantly coming back to us for 'handouts', is now fighting with the National Guard, who saved her from great embarrassment...over the last number of nights.  If she doesn't treat these men and women well, then we'll bring in a different group of men and women!"

38.    That evening, President Trump continued, "@MayorBowser is grossly incompetent, and in no way qualified to be running an important city like Washington,

D.C.  If the great men and women of the National Guard didn't step forward, she would have looked no better than her counterpart Mayor in Minneapolis!"

**The Designation of Black Lives Matter Plaza by Mayor Bowser Encouraged Protestors and Citizens to Congregate next to Lafayette Square.**

39.    "The demonstrations have settled into a rhythm as the weeks have passed. During the day, small groups of protestors are joined by tourists and families taking pictures, filming videos and buying shirts, buttons and face masks from street vendors who have set up tables around Black Lives Matter Plaza.  As the sun sets, the crowd swells – as dozens, sometimes hundreds, descend on the area around Lafayette Square." Marissa J.  Lang, *D.C. protestors dig in for the long haul after nearly months of demonstrations*, Wash. Post (June 27, 2020).

40.    Black Lives Plaza on June 22nd, had been set up as an enclave with tents for protestors and street medics that man 24-hour triage stations, a pop-up restaurant— Earl's First Amendment Grill, and as a safe place for homeless District residents driven from Lafayette Square.  In fact, Earl's First Amendment Grill was feeding between 400 and 500 people a day for free, providing food to passersby and people experiencing homelessness.

41.    That evening, protestors entered Lafayette Square and attempted to pull down a statue of President Andrew Jackson around 8 p.m.  *See* Frederick Kunkle, Susan Svrluga, and Justin Jouvenal, *Police thwart attempts by protestors to topple statue of Andrew Jackson near White House*, Wash. Post (Jun 23, 2020).

42.    Later on June 22nd, protestors spray-painted "BHAZ," which stands for Black House Autonomous Zone, on each of the columns of St. John's Church, the same church President Trump had his photo-op a few weeks earlier.

43.     This image is from Kaitlan Collins, the CNN White House Correspondent taken and uploaded to twitter at 10:03pm on June 22, 2020.



44.     The protestors' attempt to topple the Andrew Jackson Statue attracted President Trump's attention.  At 10:46 p.m., The President tweeted, "Numerous people arrested in D.C. for the disgraceful vandalism, in Lafayette Park, of the magnificent Statue of Andrew Jackson, in addition to the exterior defacing of St. John's Church across the street.  10 years in prison under the Veteran's Memorial Preservation Act. Beware!"

**Once President Trump Became Aware of the "BHAZ" markings, the President Made Clear He Will Not Allow the Creation of an Autonomous Zone in D.C.**

45.    The next morning, June 23, 2020, at 8:45am, President Trump tweeted:



Donald J. Trump ✔
@realDonaldTrump

This Tweet violated the Twitter Rules about abusive behavior. However, Twitter has determined that it may be in the public's interest for the Tweet to remain accessible. Learn more

There will never be an "Autonomous Zone" in Washington, D.C., as long as I'm your President. If they try they will be met with serious force!

8:45 AM · Jun 23, 2020 · Twitter for iPhone

46.    The Washington Post reported that the "President, who has been increasingly critical of the mayor, is demanding aggressive action to remove the 'Black House Autonomous Zone" and has already demonstrated he is willing to deploy military and take extraordinary steps to quell civil unrest."  Julie Zauzmer, Fenit Nirappil, *Tensions between Bowser, Trump reignite as president again raises threat of federal force in D.C.*, Wash. Post (June 23, 2020).

47.    The message to the District was clear.  Take control of the protestors, or we will.

**The District Took Immediate Action to Remove the Protestors in Black Lives Matter Plaza via Its Encampment Removal Protocol.**

48.    On or about June 22nd or 23rd, Mayor Bowser convened a meeting with her top administration officials to determine the appropriate steps to resolve the BHAZ situation and appease the White House.  The agreed upon action was to remove all protestors and send a message that an autonomous zone would not be tolerated in Black Lives Matter Plaza.

49.     At this meeting, the following defendants or representatives from their agencies were present based upon the actions taken by their agencies over the next few days: Defendant Bowser; Defendant Newsham (MPD); Defendant Racine (DC Attorney General); Defendant Geldart (DC DPW); Defendant Nesbitt (DC Health); Defendant Turnage (DC Deputy Mayor's Office on Health and Human Services); and others.  The participants offered their views on the best ways to respond to Presidential pressure and their respective agencies took action over the next few days.

50.     After considering the perspectives from her administration and the political ramifications of federal control over the police force and the unprecedented legal battle that would ensue, Mayor Bowser decided to order the removal of the protestors. "Asked Tuesday, [June 23, 2020], whether the District was taking a hard line on the "autonomous zone" to avoid a police takeover, D.C. police Chief Peter Newsham would only say: 'I don't think the mayor is going to allow anyone to take over the Metropolitan Police Department.'"  Julie Zauzmer and Fenit Nirappil, *Tensions between Bowser, Trump reignite as president again raises threat of federal force in D.C.*, Wash. Post (June 23, 2020).

51.     The MPD, under the direction, supervision, and orders from Defendant Newsham took coordinated action at Black Lives Matter Plaza to remove protestors and individuals in that location and deprive them of their belongings.  Defendant Newsham coordinated this action with Defendant Geldart, because employees from DPW were responsible for the removal and disposal of protestor's property.

52.     In actions against the protestors on June 22nd and June 23rd, MPD officers used batons, riot shields, and pepper spray on protestors to remove them from the

area according to Romulo Richardson, an individual on the scene those two days.  Nathan Diller and Jenny Gathright, *D.C. police, Officials Clear Encampment At Black Lives Matter Plaza*, DCist (June 23, 2020).

53.    At or about this meeting, the decision was made to declare the area an "encampment."  Defendant Turnage, D.C.'s Deputy Mayor for Health and Human Services, whose office is responsible for the removal of all other encampments in the city and who was tasked with conveying the official response of the District, emailed DCist, "We are always concerned when we have people staying in tents outside—it is not safe. It is also a serious concern, if they are staying in tents in the middle of the road. Therefore, today, we deployed our interagency team to talk with the people staying on H Street and, eventually, to remove the tents."  Nathan Diller and Jenny Gathright, *D.C. police, Officials Clear Encampment At Black Lives Matter Plaza*, DCist (June 23, 2020).

54.    D.C. officials reported to FOX 5 DC that DPW and DC Health had visited the encampment on Monday, June 22, 2020, and determined it was an unsafe environment.  Paul Wagner, *Protestor encampment cleared out of Black Lives Matter Plaza*, FOX 5 DC (June 23, 2020).

55.    The District defines an "encampment" as "a set-up of an abode or place of residence of one or more persons on public property or an accumulation of personal belongings that is present even when the individual may not be."  Encampments, Office of the Deputy Mayor for Health and Human Services *available at* https://dmhhs.dc.gov/page/encampments.

56.    The Protocol specifically provides that the District

16

will make reasonable efforts to collect and store the following kinds of Eligible Property when they are in plain sight, even if they are unattended at the time of the cleanup:

Any form of personal identification, including without limitation, driver's licenses, passports, and Social Security cards;

Photographs; financial, legal, or medical documents; other documents of obvious importance;

Medications or medical or mobility devices;

Other property that is safe to store and of apparent value.

District of Columbia, Protocol for the Disposition of Property Found on Public Spaces and Outreach to Displaced Persons, Part VI.C.

57.     The District did not follow its own protocols for the removal of encampments.  For example, "On the morning of the scheduled cleanup, DHS will offer containers to all individuals experiencing homelessness present for storage of their belongings, including two 40-gallon storage containers."  This was not done.  "DHS will arrive at the site at least one half hour in advance of the posted cleanup time to confirm everyone who is interested in packing belongings on site has the opportunity to do so."  This too was not done.

58.     The predominant police activity occurred in the morning of June 23rd, where MPD officers secured the area and employees from the DPW removed and disposed of all personal property on 16th Street NW closer to H Street, by St. John's Church.

59.     Employees of DPW drove a trash truck on to Black Lives Matter Plaza, and all of the personal property was thrown into the trash.

60.     The typical personnel who supervise and handle encampment removal were not used or consulted.  Typical encampment protocols and procedures were not followed:  There were no signs posted.  There were no interventions by encampments staff to assist individuals who may be homeless.  There was no consideration or protection of potentially important personal items that are supposed to be secured and stored by the District for a 60-day period.  There were no cards providing people with information on how to recover their property.

61.     "Leigh McAlpin, who ran a medical tent called the D.C. Aid Station outside St. John's for three weeks, was also cleared out.  She said police threw away thousands of dollars worth of medical supplies and other items on Tuesday morning." Nathan Diller and Jenny Gathright, *D.C. Police, Officials Clear Encampment At Black Lives Matter Plaza*, DCist (June 23, 2020).

62.     The purpose for disregarding normal procedures was to send a message to protestors: You will not create an autonomous zone in the District.

63.     This is what Black Lives Plaza looked like at 1:12pm on June 23, 2020, after the initial clearing of the encampment nearer H Street and before any action to clear out an encampment at 16th Street and K Street NW.

18



64.      A second encampment clearing action occurred later in the day at

approximately 3:00pm.

**Plaintiff Dionte Coley Stood Waiting for the Bus When MPD Swarmed the Area, Separated Him from His Backpack, and Threw It Away Like Garbage.**

65.      Mr. Coley is a 38 year-old, African-American male.  He is a cook.  Before

the global coronavirus pandemic, Mr. Coley found work as a cook for a temporary

staffing agency.  When kitchens or restaurants needed someone to fill in, the agency

would send Mr. Coley.  But, on or about March 24, 2020, when Defendant Bowser issued

stay-at-home orders, which effectively shut down the District's kitchens, Mr. Coley

realized that there would be no jobs for the foreseeable future.  He put all of his things

into a storage locker, and packed a small, black backpack with all of the things he might

need to last out the pandemic while sheltering with some family in Raleigh, North

Carolina.

66. After several months passed, Defendant Bowser announced Phase II

reopening to occur on June 22, 2020. This would effectively reopen kitchens and

restaurants, and so Mr. Coley planned his return to his hometown of Washington, DC.

He made arrangements to rent a room in a house for $900 and called some family and

friends to let them know he was coming back.

67. Mr. Coley said his good-byes to his family in North Carolina, and at

5:30pm on June 22nd Mr. Coley boarded a Megabus from Durham, N.C., to Washington,

D.C. After about five hours of bus travel, Mr. Coley disembarked at Union Station at

around 10:45pm. He was tired, but grateful that he would be able to spend the night with

a close friend that lived near 11th Street and P Street NW.

68. The next morning, June 23rd, after breakfast, Mr. Coley started into the

city to get settled. He knew it was going to be another hot, sweltering day. Ultimately,

he needed to get to NE, where he had friends and family to reconnect with. He planned

to stay with one of them for a few days until he could get on his feet. Mr. Coley ended

up at Martha's Table and secured a bag of food.

69. Mr. Coley knew about Martha's Table, the Men's Shelter, and other

services available to low-income individuals as he had struggled with homelessness on-

and-off for several years prior to the pandemic. Before the coronavirus pandemic, Mr.

Coley had been in a good place. He was making decent money. He had a place to live.

Things were looking up.

70.     After Mr. Coley received his bag of healthy food from Martha's Table, he went to Meridian Park, one of his favorite places in the District, to eat lunch in the shade.

71.     Around 1:30pm, Mr. Coley began to make his way to NE.  He boarded a southbound bus and planned to catch an eastbound bus at the Farragut West transfer. When he arrived at Farragut West, he discovered that there were no eastbound buses stopping there.  The sun was beating down, and it was only getting hotter and more humid later in the day.  He bought a water bottle from the 7/11 and sat on a bench in Farragut West Square to consider his dilemma.  He decided that he could probably get a transfer to an eastbound bus off of K Street – and better yet, the bus stops on K Street had digital displays showing how long he would have to wait.

72.     At approximately 2:30pm, Mr. Coley walked from Farragut West to K Street and went to the bus stop at the intersection of K Street NW and 16th Street NW. He noticed that there appeared to be a large group of people in the area, some milling about and some sitting in tents.  It was only when Mr. Coley got closer to the bus stop did he notice the large yellow paint on the ground and realized that he was in Black Lives Matter Plaza, as he had seen on the news a few weeks ago.

73.     Mr. Coley was unaware of the events the evening prior.  He did not know that protestors had attempted to pull down the statue of President Andrew Jackson.  He did not know that MPD had forced protestors from the area as part of an encampment clearing operation earlier that morning.  He did not know that DPW had confiscated and disposed of protestor's tents and other belongings.

74.     Mr. Coley passed no signs and was given no warning by police alerting him to the area's designation as an encampment as walked to the bus stop.  No one told

him or alerted him that there was an imminent police action being set up.  Mr. Coley did

not notice anyone in the area other than an MPD presence and protestors, visitors, tourists,

and other individuals congregating in Black Lives Matter Plaza.  There was no active

MPD activity suggesting any removal was occurring or scheduled to occur.

75.   Mr. Coley was happy to wait at the bus stop, because it was right next to a

Starbucks Coffee, and normally, he would be able to use their free Wi-Fi as he waited the

40 minutes or so the display indicated it would take for the #80 bus to arrive.

76.   It is around this time that he noticed an individual rubbing his face, eyes,

and hair with milk.  The individual told Mr. Coley that earlier the police had used pepper

spray on some of the protestors, but that everything had calmed down.  Mr. Coley

surveyed the area, as he had learned to do as someone who experienced homelessness.

He observed everyone acting peacefully.  The individual invited him to sit in the tent to

get out of the sun while waiting for the bus, and offered him a bottle of water.  Mr. Coley

accepted.

77.   After finishing his water, Mr. Coley looked at the display at the bus stop.

The #80 bus would come in about 20 minutes.  To pass the time, Mr. Coley lit and

smoked a cigarette.  He moved a few steps away from the tent and his bag so his smoke

would not bother anyone.

78.   Suddenly, in an overwhelming show of force over a hundred MPD officers

swarm the area.  They screamed "MOVE" and "GET THE F*** OUT OF THE WAY"!

The MPD advanced with a line of officers moving like a Roman phalanx corralling all of

the people so they were surrounded by MPD officers against the wall on the southwest

corner of the intersection of 16th Street and K Street NW.  At least two police officers

shoved Mr. Coley, and at least 12 police officers cornered him against the building in the
southwest corner of the intersection.  The police let no one they surrounded leave, and
they separated Mr. Coley from his backpack.

79.    The following image, a view of the intersection of 16th Street NW and K
Street NW at approximately 3:40pm on June 23, 2020, is from ABC7 Reporter Tom
Roussey who was on the scene and was live streaming video and still images:



80.    Mr. Coley was frightened even though he knew he had done nothing
wrong and did not want to get beaten up or pepper sprayed by the cops.

81.    When MPD officers finally permitted all of the cornered individuals to
leave, Mr. Coley tried to find an MPD officer—any MPD officer—who would listen to
him.  Mr. Coley was never a protestor.  He was an individual in desperate need of the

backpack that contained all of his important documents and possessions.  Not one officer would help him.

82.     MPD officers threw all of the items, tents, bags, (including Mr. Coley's backpack) into a pile into the intersection of 16th Street NW and K Street NW which was surrounded and protected by MPD officers.

83.     Finally, one MPD bike officer listened to Mr. Coley.  The MPD bike officer told Mr. Coley that the officer would not help Mr. Coley get his backpack, but if Mr. Coley could get past the line of officer and get close enough to the bag, then the officer would ensure that he was not attacked by other MPD officers.  After what happened to Mr. Floyd, Mr. Coley was not going to cross the police and could get close enough to his backpack.  Other MPD officers chastised the bike officer for even speaking with Mr. Coley.

84.     At a certain point, an orange DPW garbage truck drove up into the intersection.  MPD officers and employees of DPW took all of the items in the intersection and threw them into the garbage receptacle of the trash truck.  The trash truck drove off and all of the items were taken to a transfer station on the way to the dump in Fairfax, Virginia.

85.     The following still image comes from a video from ABC7 reporter Tom Roussey who was taping the removal of personal property in the garbage truck by MPD and employees of DPW at 3:39pm on June 23, 2020.



86.    MPD and DPW made no efforts to examine the personal belongings taken. They did not follow encampment protocols to protect against the destruction of important and personal property.  They did not ticket any of the items for storage and retrieval. They did not examine items closer at an off-site location.  They did not provide any of the individuals a means to appeal or recover their property.  The provided no note cards. They would not listen to pleas of people, some of whom were homeless begging them not to destroy their belongings.

87.    Mr. Coley persistently tried to find an officer who would listen as he walked around the intersection.  Another MPD officer told Mr. Coley, "Forget the F******g bag, it's F******g gone.  You're not getting it back."

88.    With no way to retrieve his backpack and no way to contact his friends and family, Mr. Coley got on a bus to NE and went to the Men's Shelter.

**The Seizure of Mr. Coley's Property Harmed Mr. Coley.**

89.    This is the contents of Mr. Coley's backpack:

a)    Cell Phone and Charger;
b)    Social Security Card;
c)    Birth Certificate;
d)    Financial Documents;
e)    ServSafe Certification;
f)    Cosmetic's Bag, e.g., toothpaste, toothbrush, etc.;
g)    Medications;
h)    Fresh Pairs of Socks;
i)    Three Sets of Clothes;
j)    $800 in Cash for Room Rental; and
k)    The Key to Mr. Coley's Storage Locker.

90.    Mr. Coley also had a bag of food he had obtained earlier from Martha's Table that was taken and destroyed as well.

91.    Mr. Coley's cell phone was his main way to communicate with his friends and family.  All of the numbers are programmed into the phone.  Without this phone, Mr. Coley was and remains isolated from his friends and family.  He lost forever photos, videos, and memories stored on his phone.

92.    In order to find employment, employers require social security cards, birth certificates, financial documents, and other relevant certifications.  Without these documents, Mr. Coley cannot find work in the District.  Obtaining replacement documents is difficult because all authenticating documentation had been seized and disposed of.  Mr. Coley was left isolated and alone.

93.    He lost his cosmetic bag, medications, fresh socks, and sets of clothes, all of which he needed to have a chance to be self-reliant and to have a sense of dignity and worth.

94.     The $800 that Mr. Coley had set aside for rent now means that Mr. Coley has no other money besides the $230 he had on his person.  Each day, without the ability to get a job, the money dwindled to nothing.  As of filing, Mr. Coley has no more money.

95.     Since Mr. Coley's locker key is destroyed, there is no easy way to get access to his things locked away in the storage locker without cutting the lock and replacing it with another lock, all of which costs money that Mr. Coley does not have.

96.     The effects on Mr. Coley by the District's seizure of his backpack are dramatic and life altering, forcing a man trying to get onto his feet back onto his knees.

## CAUSES OF ACTION

### Count I
### <u>Violation of the Fourth and Fourteenth Amendments under 42 U.S.C. § 1983</u>
### (Against All Defendants)

97.     Plaintiff restates and realleges all the allegations set forth above.

98.     The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures.

99.     The Fourth Amendment is applied to the states through the Fourteenth Amendment.

100.    Under 42 U.S.C. § 1983, municipal defendants are "persons" liable for unconstitutional customs, practices, policies, and decisions.

101.    Under 42 U.S.C. § 1983, every person acting under color of state law who deprives another person of his or her constitutional rights is also liable at law and in equity.

102.    All Defendants were public officials or employees carrying out their official responsibilities in accordance with state law.

103.    In response to threats from the White House, Defendants Bowser, Newsham, Racine, Geldart, Nesbitt, and Turnage, and other Bowser Administration officials devised a custom, practice, policy, or decision by persons with final policy making authority to determine the course of action to remove protestors from the Black Lives Matter Plaza, by designating such an area an encampment and utilizing District resources to secure the removal and disposal of protestors and their property from the area in such a way as to necessarily deprive individuals their Fourth Amendment rights under the U.S. Constitution.

104.    In carrying out this custom, practice, policy, or decision all Defendants intentionally deprived protestors of their Fourth Amendment rights or intentionally disregarded the likely constitutional violation of their Fourth Amendment rights in the manner in which they organized the removal and disposal of protestors' and individuals' personal property at Black Lives Matter Plaza on June 23, 2020.

105.    Defendants Bowser, Newsham, Racine, Geldart, Nesbitt, and Turnage were deliberately indifferent to the failure to adopt policies necessary to prevent the Fourth Amendment constitutional violations.

106.    These actions proximately caused Plaintiff's injuries when District officials in the form of Defendants Four Unidentified Metropolitan Police Officers and At Least Three Unidentified Employees of the Department of DPW physically separated Plaintiff from his backpack, seized his backpack, and destroyed his backpack.

107.    Plaintiff was deprived his Fourth Amendment constitutional rights to be secure from unreasonable seizures.

28

**Count II**
**Violation of the Fifth and Fourteenth Amendments under 42 U.S.C. § 1983**
**(Against All Defendants)**

108.    Plaintiff restates and realleges all of the allegations set forth above.

109.    The Fifth Amendment to the United States Constitution prohibits the deprivation of property without due process of law.

110.    The Fifth Amendment is applied to the states through the Fourteenth Amendment.

111.    In response to threats from the White House, Defendants Bowser, Newsham, Racine, Geldart, Nesbitt, and Turnage, and other Bowser Administration officials devised a custom, practice, policy, or decision by persons with final policy making authority to determine the course of action to remove protestors from the Black Lives Matter Plaza, by failing to comply with existing encampment protocols or provide procedural mechanisms that would otherwise provide due process protections for individuals dispossessed of their property.

112.    Defendants Bowser, Newsham, Racine, Geldart, Nesbitt, and Turnage, and other Bowser Administration officials made no efforts to provide notice written or otherwise to protestors that their property would be seized and destroyed; to provide an opportunity to be heard prior to the seizure of protestors' property; or to provide any sort of appeal process by which an individual dispossessed of his or her property might seek review prior to the destruction of his or her property.

113.    In application of the custom, practice, policy, or decision by persons with final policy making authority, all Defendants made no efforts to inform Plaintiff that he was entering an area designated an "encampment" and subject to severe government

29

action; to notify Plaintiff that if he was in the encampment area his property would be subject to seizure and destruction; to instruct Plaintiff what if any procedures were in place to protect his property from seizure and destruction; and to inform Plaintiff how he might challenge the seizure by the Government through any process including appeal.

114.    These actions proximately caused Plaintiff's injuries when District officials in the form of Defendants Four Unidentified Metropolitan Police Officers and At Least Three Unidentified Employees of the Department of DPW physically separated Plaintiff from his backpack, seized his backpack, and destroyed his backpack.

115.    Plaintiff was deprived of his Fifth Amendment rights for his property to be secure from government intervention without due process of law.

**Count III**
**Intentional Infliction of Emotional Distress**
**(Against All Defendants)**

116.    Plaintiff restates and realleges all of the allegations set forth above.

117.    An intentional infliction of emotional distress claim consists of the following elements in the District of Columbia: the conduct was (1) extreme and outrageous; (2) intentional or reckless; and (3) causes severe emotional suffering.  *See District of Columbia v. Tulin*, 994 A.2d 788 (D.C. 2010).

118.    The actions taken by Defendants were designed to send a message to protestors in Black Lives Matter Plaza—you will not create an autonomous zone in the District.  To that end, the actions were designed to be punitive.

119.    By 3:00pm on June 23, 2020, no protestors were actively fighting or resisting MPD requests to leave the area.  In fact, MPD officers made no requests of the

individuals in the area and freely allowed people to enter and exit Black Lives Matter Plaza.

120.    The significant show of force with hundreds of MPD officers who rushed in and screamed and yelled at innocent bystanders, people who were not protestors, who had committed no crime, and had done nothing wrong, was extreme and outrageous.

121.    The fact that such an operation was designed in this way for a group of peaceful protestors in the middle of the day was extreme and outrageous.

122.    The taking of the Plaintiff's backpack, which was his only means to stave off homelessness, was extreme and outrageous.

123.    The conduct by Defendants was intentional or reckless.  The fact that Defendants designed such an operation as to punish protestors through the deprivation of their property set for immediate destruction was intentional or reckless.  The choice not to follow the District encampment removal protocols or to use employees typically involved in encampment removal was intentional or reckless.

124.    The actual manner in which MPD officers and employees of DPW separated individuals from their property, seized the property, and destroyed the property was intentional or reckless.

125.    Plaintiff has suffered severe emotional distress by the actions caused by Defendants.

## Count IV
## <u>Conversion</u>
## (Against All Defendants)

126.    Plaintiff restates and realleges all of the allegations set forth above.

127.    The tort of conversion has four elements: (1) plaintiff owns personal property; (2) defendant intentionally interfered with plaintiff's personal property; (3) defendant's interference deprived the plaintiff of his or her possession of the property; and (4) defendant's interference caused plaintiff damage.

128.    Plaintiff owned a black backpack that contained important possessions.

129.    Defendants directed or by their own actions and without cause seized Plaintiff's backpack and all the things in the backpack.

130.    Defendants destroyed Plaintiff's backpack and all of the things in the backpack by disposing of the property into the dump.

131.    Plaintiff has suffered significant damage as a result of Defendants' interference.

## Count V
## <u>Civil Conspiracy</u>
## (Against All Defendants)

132.    Plaintiff restates and realleges all of the allegations set forth above.

133.    The elements for the tort of civil conspiracy in the District of Columbia are: "(1) an agreement between two or more persons; (2) to participate in an unlawful act, or in a lawful act in an unlawful manner; and (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement (4) pursuant to, and in furtherance of, the common scheme." *Weishapl v. Sowers*, 771 A.2d 1014, 1023 (D.C. 2001) (internal citations omitted).

134.    Defendants discussed, determined, and agreed to a course of action to remove protestors from Black Lives Matter Plaza and to discourage the protestors from creating an autonomous zone in the District of Columbia.

135.    Defendants participated in an unlawful act or in a lawful act in an unlawful manner in several ways.  Defendants were authorized by law to remove an encampment, and made efforts for the area to be so designated, but in doing so, Defendants violated Plaintiff's and other individuals' rights as to the seizure of their property in violation of the U.S. Constitution.

136.    Another way to look at the situation, Defendants participated in an unlawful act when they violated the Constitution in the seizure of Plaintiff's, protestors, and other individuals' personal property.

137.    The deprivation of Plaintiff's personal property in an injury caused by Defendants' unlawful and overt act, which had been conducted pursuant to and in furtherance of Defendants' common scheme.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court

a.  declare Defendants violated Plaintiff's constitutional rights;

b.  award him compensatory damages with Defendants' being jointly and severally liable for (1) the Defendants' violation of his Constitutional rights, (2) the Defendant's intentional infliction of emotional distress; (3) the conversion of his property; and (4) Defendants' civil conspiracy to injure him through their unlawful joint activity;

c.  award him punitive damages with Defendants' being jointly and severally liable to the extent permissible under the law;

   d.   award him reasonable attorneys' fees, expert and consulting fees, and costs

        pursuant to 42 U.S.C. § 1988 and any other applicable statute or regulation

        with Defendants' being jointly and severally liable;

   e.   and grant such further relief as the Court deems just and proper.


### JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury on all counts so triable.



Dated: August 11, 2020                    Respectfully submitted,



                                          Jonathan K. Gitlen
                                          _____

                                          Jonathan K. Gitlen (D.C. Bar No. 990918)
                                          Law Office of Jonathan K. Gitlen PLLC
                                          900 19th Street, NW, Fifth Floor
                                          Washington, DC 20006
                                          Tel.: (202) 568-5788
                                          Fax: (202) 301-8556
                                          Email: jonathan.gitlen@jgitlenlaw.com


                                          *Attorney for Plaintiff Dionte Coley*