## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| DIONTE COLEY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) |
| | ) |
| v. | ) OPPOSITION TO DEFENDANTS' |
| | ) MOTION TO DISMISS |
| | ) (MEMO. OF POINTS AND |
| | ) AUTHORITIES) |
| | ) |
| MURIAL BOWSER, *et al.*, | ) Civil Action No.: 1:20-cv-02182-CKK |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

## MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS KARL RACINE, MURIEL BOWSER, PETER NEWSHAM, CHRISTOPHER GELDART, LAQUANDRA NESBITT, AND WAYNE TURNAGE'S MOTION TO DISMISS

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ........................................................................................ iv

**STATEMENT OF FACTS** ........................................................................................ 6

**ARGUMENT** .......................................................................................................... 9

I.    **DEFENDANTS VIOLATED COLEY'S FOURTH AMENDMENT RIGHT AGAINST UNREASONABLE SEIZURES WHEN MPD OFFICERS SHOVED COLEY, TOOK HIS BAG, AND DESTROYED IT.** ...................... 10

    A. The Seizure of Coley's Bag was *Per Se* Unreasonable. ..................................... 10

    B. The Community Caretaker Exception to the Warrant Requirement Does Not Apply, Because the Decision to Seize was Unreasonable and No Reasonable Procedures Governed the Seizure. ....................................................................... 12

    C. Defendants Decision to Destroy Coley's Backpack Makes the Seizure Unreasonable and in Violation of the Fourth Amendment. ............................... 16

II.    **DEFENDANTS VIOLATED COLEY'S FIFTH AMENDMENT RIGHT TO PROCEDURAL DUE PROCESS WHEN DEFENDANTS FAILED TO PROVIDE ADEQUATE NOTICE AND ANY HEARING PRIOR TO THE DESTRUCTION OF COLEY'S BACKPACK.** ................................................ 16

    A. Defendants Did Not Provide Any Notice to Coley that his Backpack Would be Seized and Destroyed. ...................................................................................... 16

    B. Defendants Did Not Provide a Hearing Prior to the Destruction of Coley's Backpack. ........................................................................................................... 19

III.    **DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY, BECAUSE DEFENDANTS VIOLATED COLEY'S CONSTITUTIONAL RIGHTS AND THESE CONSTITUTIONAL RIGHTS ARE CLEARLY ESTABLISHED.** ..................................................................................................... 21

IV.    **THE COURT SHOULD NOT DISMISS COLEY'S OFFICIAL CAPACITY CLAIMS AGAINST DEFENDANTS, BECAUSE THE DISTRICT OF COLUMBIA IS NOT A NAMED DEFENDANT.** ............................................... 24

V.    **THE COURT SHOULD NOT DISMISS COLEY'S COMMON LAW TORT CLAIMS, BECAUSE COLEY ALLEGED SPECIFIC, INTENTIONAL OR**

**RECKLESS ACTIONS BY DEFENDANTS TO SEIZE AND DESTROY BLM PROTESTOR PROPERTY.** ................................................................... 25

A. Coley Properly Pled Count III: Intentional Infliction of Emotional Distress..... 26

B. Coley Properly Pled Count IV: Conversion. ....................................................... 27

C. Coley Properly Pled Count V: Civil Conspiracy................................................. 28

**VI.    THE COURT SHOULD ASSERT SUPPLEMENTAL JURISDICTION OVER COLEY'S COMMON LAW CLAIMS.** .................................................. 29

**CONCLUSION** ........................................................................................................... 29

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Creighton*
483 U.S. 635 (1987).................................................................................... 22

*Ashcroft v. al-Kidd*,
563 U.S. 731 (2011)................................................................................... 22

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).................................................................................. 10

*Askew v. Sheriff of Cooks County*,
568 F.3d 632 (7th Cir. 2009) ................................................................... 25

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)..................................................................................... 9

*\*Bloem v. Unknown Dep't of the Interior Employees*,
920 F. Supp. 2d 154 (D.D.C. 2013) ....................................................... 23

*Butz v. Economou*,
438 U.S. 478 (1978)................................................................................... 23

*Cotton v. District of Columbia*,
421 F. Supp. 2d 83 (D.D.C. 2006) ......................................................... 25

*Edmonds v. United States*,
563 F. Supp. 2d 196 (D.D.C. 2008) ....................................................... 27

*Fuentes v. Shevin*,
407 U.S. 67 (1972)..................................................................................... 19

*Halberstam v. Welch*,
705 F.2d 472 (D.C. Cir. 1983) ................................................................ 28

*Howard Univ. v. Best*,
484 A.2d 958 (D.C. 1984) ....................................................................... 26

*Illinois v. Caballes*,
543 U.S. 405 (2005)................................................................................... 16

*Kentucky v. Graham*,
473 U.S. 159 (1985)................................................................................... 25

*Kurd v. Republic of Turkey*,
374 F. Supp. 3d 37, 55 (D.D.C. 2019) .............................................. 26, 27

*Lavan v. City of L.A.*,
693 F.3d 1022 (9th Cir. 2012) ................................................................ 16

*Logan v. Zimmerman Brush Co.*,
455 U.S. 422 (1982).............................................................................. 19, 20

*Malley v. Briggs*,
475 U.S. 335 (1986)................................................................................... 22

*Mathews v. Eldridge*,
    424 U.S. 319 (1976) ........................................................... 17

*Michigan v. Tyler*,
    436 U.S. 499 (1978) ........................................................... 13

*Morrissey v. Brewer*,
    408 U.S 471 (1972) ............................................................ 16

*Mullenix v. Luna*,
    136 S.Ct. 305 (2015) .......................................................... 21

*Ortiz v. Jordan*,
    562 U.S. 180 (2011) ........................................................... 23

*Parratt v. Taylor*,
    451 U.S. 527 (1981) ........................................................... 20

*Pearson v. Callahan*,
    555 U.S. 223 (2009) ........................................................... 21

*Propert v. District of Columbia*,
    948 F.2d 1327 (D.C. Cir. 1991) ......................................... 19

*S. Commons Condo. Ass'n v. City of Springfield*,
    967 F. Supp. 2d 457 (D. Mass. 2013) ............................... 20

*Skinner v. Ry. Labor Execs.*,
    489 U.S. 602 (1989) ........................................................... 15

*Soldal v. Cook County, Ill.*,
    506 U.S. 56 (1992) ....................................................... 10, 11

*South Dakota v. Opperman*,
    428 U.S. 364 (1976) ........................................................... 13

*Sparrow v. United Air Lines, Inc.*,
    216 F.3d 1111 (D.C. Cir. 2000) ......................................... 10

*United States v. Jacobsen*,
    466 U.S. 109 (1984) ..................................................... 11, 16

*United States v. Proctor*,
    489 F.3d 1348 (D.C. Cir. 2007) ..................................... 13, 14

*Waldon v. Covington*,
    415 A.2d 1070 (D.C.1980) ................................................ 28

*Weishapl v. Sowers*,
    771 A.2d 1014 (D.C. 2001) ................................................ 28

**Constitutional Provisions**

U.S. Const. amend. IV ............................................................. 12

U.S. Const. amend. V .............................................................. 18

## STATEMENT OF FACTS

On June 23, 2020, at approximately 3:00pm the summer's sun beat down on Mr. Coley as he waited for the #80 bus at the 16th Street NW and K Street NW stop, next to Black Lives Matter ("BLM") Plaza. (Compl. ¶ 8). As a cook before the pandemic, the Mayor's Stay-At-Home Orders shuttered the District's kitchens, which meant there were no jobs. (Compl. ¶ 4). Mr. Coley had decided to shelter with his family in North Carolina, and when the Mayor announced the reopening of the District's kitchens, hurried back to the District—kitchens would have an immediate need for workers. (*Id.*)

Unaware of BLM protestor and MPD activities the night before and that morning, (Compl. ¶ 73), Mr. Coley passed no signs, cordons, or other official indication that the DC government would order MPD officers to imminently clear out BLM Plaza in an extreme and physical show of force. (Compl. ¶ 74). Mr. Coley observed protestors, tourists, visitors, children, a few MPD officers acting peacefully and congregating in BLM Plaza, some milling about and some sitting in tents. (Compl. ¶¶ 72-76). When a BLM protestor offered him shelter and water from the sun and heat, Mr. Coley gratefully accepted. (Compl. ¶ 76).

The next bus would not come for another twenty minutes, and to pass the time, Mr. Coley left his bag on the ground next to where he sat, took a courteous few steps away from the tent to smoke a cigarette. (Compl. ¶ 77).

Suddenly, over one hundred MPD officers swarmed the area screaming "MOVE" and "GET THE F*** OUT OF THE WAY!" shoving everyone in their path. (Compl. ¶ 78). Two MPD officers shoved Mr. Coley from behind, and at least twelve MPD officers cornered him and others against the building in the southwest corner of the intersection.

(*Id.*).  The MPD would not allow anyone they corralled to leave when MPD officers separated Mr. Coley from his backpack.  (*Id.*).

When it became clear that MPD officers were not going to beat, pepper spray, or arrest Mr. Coley, he immediately asked one MPD officer after another to allow him to retrieve his backpack.  (Compl. ¶ 81).  Mr. Coley explained that he was not a protestor and that the bag contained all of his important personal belongings.  (Compl. ¶ 11).  Not a single officer would help him.  (*Id.*).

MPD officers and employees from the Department of Public Works ("DPW") took Mr. Coley's bag along with other items owned by bystanders caught up in the MPD operation.  (Compl. ¶ 82).  The officers and employees threw these items into the middle of the intersection of 16th Street NW and K Street NW, (*id.*), and dumped them into the back of an orange DPW garbage truck for immediate destruction, (Compl. ¶ 84).  Mr. Coley left the area sometime thereafter with just the clothes on his back and some money in his wallet.  (Compl. ¶ 88).

Apparently, the night before and two-blocks away from where Mr. Coley now stood, BLM protestors drew the ire of President Trump when they attempted to topple a statue of President Andrew Jackson in Lafayette Square and to designate the Black House Autonomous Zone in the area of St. John's Church, located at H Street, NW, and 16th Street, NW (Compl. ¶ 41).  These actions exacerbated an on-going political dispute between the Trump Administration and the Bowser Administration.  (Compl. ¶¶ 33-47).

The Trump Administration wanted a significant show of police force to demonstrate to the world that President Trump was not weak.  (Compl. ¶ 30).  Nothing was off the table, and the Trump Administration had considered taking the unprecedented

steps of assuming operational control of the MPD several weeks earlier.  (Compl. ¶ 35).

The Bowser Administration wanted to showcase support for the BLM movement while

frustrating the Trump Administration's goals in politically motivated ways,

predominantly through media appearances and the creation of BLM Plaza.  (Compl. ¶ 36).

Debatably, the threat to seize control of the District's police force was something

very different—the Bowser Administration considered that a lawful order by the

President under Section 740 of the 1973 Home Rule Act would be "tantamount to a

government overthrow," Peter Hermann, Fenit Nirappil and Josh Dawsey, *Trump

Administration considered taking control of D.C. police force to quell protests*, Wash.

Post (June 2, 2020).   (Compl. ¶ 35).  With BLM activities largely uneventful following

June 1, the Bowser Administration believed the threat had passed, but on June 22, 2020,

the Bowser Administration once again found itself under renewed threat from the Trump

Administration.  (Compl. ¶ 47).

On or about June 22nd or 23rd, Mayor Bowser convened a meeting with her top

administration officials to determine the appropriate steps to resolve the "autonomous

zone" situation, considering the political ramifications such an action would have on DC

Statehood efforts, for example.  (Compl. ¶¶ 48-50).  Mayor Bowser decided to appease

the President.  (Compl. ¶ 50).  Based on the actions taken by representatives from the DC

Government, the following administration officials participated in planning and

implementing the Mayor's decision to order the removal of protestors from the

"autonomous one" and seize and destroy their property: Defendant Bowser; Defendant

Newsham (MPD); Defendant Racine (DC Attorney General); Defendant Geldart (DC

Department of Public Works); Defendant Nesbitt (DC Health); Defendant Turnage (DC

8

Deputy Mayor's Office on Health and Human Services); and others. (Compl. ¶ 49). Each of these individuals were necessary and critical to organize and implement the DC Government's show of force through the forced removal, seizure, and destruction of personal property in and around the area of Black Lives Matter Plaza. (Compl. ¶¶ 50-54).

The plan required the area be declared an "encampment"; the removal was for health and safety reasons (Compl. ¶ 53); the MPD to use batons, riot shields, and pepper-spray to secure the area and remove protestors, (Compl. ¶ 54); and the Department of Public Works to seize and destroy all property in the area, (Compl. ¶ 59). To ensure the destruction of property, Mayor Bowser decided not to follow the District's protocols for the removal of encampments—the typical personnel who supervise and handle encampment removal were not used nor consulted and the typical encampment protocols were not followed. (Compl. ¶ 57; 60). The purpose for disregarding normal procedures was to send a message to protestors: You will not create an autonomous zone in the District. (Compl. ¶ 62).

The District completed its clearing of the encampment in the area of H Street, NW, and 16th Street, NW, at approximately 1:00pm on June 23rd. (Compl. ¶ 63). Between 1:00pm and 3:00pm, the District took no further action in Black Lives Matter Plaza, until the second police operation described above.

## ARGUMENT

The Federal Rules of Civil Procedure require that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what . . . the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a

9

claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation omitted). "In evaluating a motion to dismiss, the Court must treat the complaint's factual allegations as true and must grant plaintiff the benefit of all inferences that can be derived from the facts alleged." *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (citation and quotation omitted).

## I.    DEFENDANTS[1] VIOLATED COLEY'S FOURTH AMENDMENT RIGHT AGAINST UNREASONABLE SEIZURES WHEN MPD OFFICERS SHOVED COLEY, TOOK HIS BAG, AND DESTROYED IT.[2]

### A.    The Seizure of Coley's Bag was *Per Se* Unreasonable.

The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized." U.S. CONST. amend. IV. "A 'seizure' of property occurs where there is some meaningful interference with an individual's possessory interest in that property." *Soldal v. Cook County, Ill.*, 506 U.S. 56, 62 (1992) *quoting United States v. Jacobsen,*

---

[1] For purposes of this opposition, "Defendants" will refer collectively to the Defendants that brought the instant motion to dismiss, i.e., Defendants Karl Racine, Muriel Bowser, Peter Newsham, Christopher Geldart, Laquandra Nesbitt, and Wayne Turnage, but not Defendants Four Unidentified Metropolitan Police Officers and At Least Three Unidentified Department of Public Work Employees. In addition, "Defendants" does not include the Defendant District of Columbia, who is not a named defendant and yet filed the other motion to dismiss without leave of the Court, see Dkt. 9.

[2] Coley agrees with Defendants that in this instance, the Fourteenth Amendment does not apply to the District of Columbia and consequently the named defendants. To the extent that the Court wishes to either dismiss or strike the portions of Counts I and II that identify the Fourteenth Amendment as a source of liability, Coley has no objection. Coley would object to a wholesale dismissal of those claims, because of alleged constitutional violations arising independently under the Fourth and Fifth Amendments, and would instead seek leave from the Court to file an amended complaint with that correction.

466 U.S. 109, 113 (1984). "Thus, in the absence of consent or a warrant permitting the seizure of the items in question, such seizures can be justified only if they meet the probable-cause standard and, if they are unaccompanied, by unlawful trespass." *Id.* at 66 (citations omitted).

There is no argument by either party that Mr. Coley in any way consented to the seizure of his backpack. In fact, as soon as it was safe to do so, and Mr. Coley no longer feared that he would be attacked, pepper-sprayed, or arrested by MPD officers, he spoke to officer after officer trying desperately to find any one that would listen—he pleaded that his backpack, just on the other side of the line of police officers, contained all of his most important documents and possessions. (Compl. ¶ 81).

Defendants make no argument that they possessed a warrant permitting the seizure or destruction of Mr. Coley's backpack. Moreover, Defendants cannot and do not try to allege there was probable cause to seize Mr. Coley's backpack. Instead, time and again Defendants commit the straw-man fallacy by attempting to mischaracterize Mr. Coley's backpack as unattended. *See e.g.*, Defs' Mot. to Dismiss, p. 3 ("The crux of Coley's claims arise because MPD officers took his personal property that he left unattended . . . ."). This mischaracterization appears in each of the motions to dismiss.

Mr. Coley never left his backpack unattended. Mr. Coley placed his backpack on the ground, when he stood at most a few feet away to smoke a cigarette so that the smoke would not bother others. (Compl. ¶ 77). Mr. Coley did not leave the area. He was not around the corner. Mr. Coley was standing right there, facing his backpack while smoking a cigarette. The area was not dangerous. (Compl. ¶ 76).

The only way to argue that Mr. Coley's bag was "unattended" is after MPD officers caused Mr. Coley to become separated from his bag when they seized him. MPD officers separated Mr. Coley and corralled him against the wall at the southwest corner of the intersection. (Compl. ¶ 78). MPD officers would not allow Mr. Coley to reclaim his backpack. (Compl. ¶ 81). Only one bike officer listened to Mr. Coley, and even he offered Mr. Coley an apathetic choice—if Mr. Coley could somehow manage to break through the line of MPD officers and grab his own backpack, this officer would try to ensure that he would not be attacked by other MPD officers. (Compl. ¶ 83). Other MPD officer publicly reprimanded the bike officer for speaking with Mr. Coley. (*Id.*). Consider the choice that Mr. Coley faced in the moment. He needed his bag, but as a black man in the United States, if you do not follow police orders, the police might kill you, like George Floyd, Eric Gardner, and others. The offer of protection from the bike officer would seem empty, because of the immediate reprimand by other MPD officers. And the risk to get your property back—the money you need to live; the documents you need to work—is death. What was Mr. Coley supposed to do?

Despite Defendants' attempts to the contrary, this is not a difficult or complicated case. MPD officers under the direction of Defendants took Mr. Coley's bag. Absent an exception to the warrant requirement under the Fourth Amendment, the seizure of Mr. Coley's backpack was *per se* unreasonable.

**B.     The Community Caretaker Exception to the Warrant Requirement Does Not Apply, Because the Decision to Seize was Unreasonable and No Reasonable Procedures Governed the Seizure.**

Defendants argue that the community caretaker exception justified Defendants' seizure of Coley's property to abate a public nuisance and protect health and safety under

the Fourth Amendment.  *See* "Def. D.C.'s Motion to Dismiss," pp. 9-11[3].  But this argument fails to apply the law from the D.C. Circuit and would have the Court draw an inference in favor of Defendants instead of Plaintiff's—that the health and safety rational was mere pretext—which on a motion to dismiss, the Court cannot do.

The community caretaker exception to the warrant requirement of the Fourth Amendment, which typically applies to cars, *see South Dakota v. Opperman*, 428 U.S. 364, 368 (1976) ("[i]n the interests of public safety and as part of what the Court has called 'community caretaking functions,' automobiles are frequently taken into police custody"), does not provide a blanket immunity from the amendment's requirement of reasonableness, s*ee Michigan v. Tyler*, 436 U.S. 499, 505 (1978) (Deviations from the typical police search, like the abatement of a public nuisance, are "clearly within the protection of the Fourth Amendment.").  When confronted with the application of the community caretaker exception, the D.C. Circuit explicitly rejected a *per se* rule that a seizure "is reasonable so long as it serves the government's community caretaking interests." *United States v. Proctor*, 489 F.3d 1348, 1354 (D.C. Cir. 2007).  Instead, the Court held that the decision to seize must be reasonable and that the seizure must comply with standardized procedures.  *Id.*  at 1353.  "We believe that if a standard impoundment

_____

[3] Def. D.C.'s Motion to Dismiss is located at docket entry 9.  For reasons addressed in Plaintiff's Opposition to that motion, it is Coley's contention that these issues are not properly before the Court.  Without waiving any right to object to its inclusion in the present proceedings, many of these arguments underlie Defendants Racine, Bowser, Newsham, Geldart, Nesbitt, and Turnage's Motion to Dismiss (hereinafter "Defs.' Mot. to Dismiss") assertions of qualified immunity, because in that motion, Defendants argue that there had been no violation of Plaintiff's Fourth and Fifth Amendment rights.  *See* Defs.' Mot. to Dismiss, Dkt. 10; pp. 8-11.

procedure exists, a police officer's failure to adhere thereto is unreasonable and violates the Fourth Amendment." *Id.* at 1354.

For reasons described above, *supra* Section (I)(A), the decision by Defendants to seize Mr. Coley's backpack were not reasonable, and consequently, under *Proctor*, the community caretaking exception would not apply. But even if one were to examine the second prong of *Proctor*, i.e., compliance with standardized procedures, Coley has amply alleged and Defendants do not dispute, the District did not comply with the procedures for removing encampments. Coley identified and alleged the Protocol for the Disposition of Property Found on Public Spaces and Outreach to Displaced Persons, Part VI.C. *See* Compl. ¶ 56. "The District did not follow its own protocols for the removal of encampments." (Compl. ¶ 57). The District did not offer containers to all individuals experiencing homelessness, (*id.*); the District did not arrive at least one-half hour in advance of the posted cleanup time to confirm everyone who is interested in packing belongings on the site has the opportunity to do so, (*id.*); the District did not use the typical personnel who supervise and handle encampment removal, (Compl. ¶ 60); the District posted no signs, (*id.*); the District made no consideration or protection of potentially important personal items that are supposed to be secured and stored by the District for a 60-day period, (*id.*); and the District provided no cards to people with information on how to recover their property, (*id.*). In the District, under *Proctor*, where a procedure exists and is not followed by the government, the community caretaking exception will not apply.

Instead, Defendants place the cart before the horse and balance plaintiff's Fourth Amendment interests against the District's. Def. D.C. Mot. to Dismiss; p. 11 ("Balancing

Coley's allegation about the evolving nature of the safety in the area against any intrusion on Coley's Fourth Amendment interest in his *unattended* backpack against the District's promotion of legitimate governmental interests to protect public health and safety and abate public nuisances, no Fourth Amendment violation occurred.") (emphasis added). Here is where Defendants continue to mischaracterize Mr. Coley's bag as "unattended," so as to minimize Mr. Coley's Fourth Amendment rights to be secure in his property from unreasonable seizure by the District. Moreover, Defendants do not seriously identify the District's interest in seizing Mr. Coley's bag, because to do so would be to challenge the factual allegations Mr. Coley made in his complaint, to wit, that the clearing of the "encampment" was a pretext to appease the Trump Administration and send a clear message to BLM protestors, "you will not create an autonomous zone in the District." (Compl. ¶ 48). When properly balancing Mr. Coley's Fourth Amendment rights against the District's interest in sending a message to protestors to appease the Trump Administration, the District's interest cannot outweigh Mr. Coley's rights. As Justice Marshall wrote:

> History teaches that grave threats to liberty often come in times of urgency, when constitutional rights seem too extravagant to endure. The World War II relocation-camp cases, and the Red scare and McCarthy-era internal subversion cases, are only the most extreme reminders that when we allow fundamental freedoms to be sacrificed in the name of real or perceived exigency, we invariably come to regret it.

*Skinner v. Ry. Labor Execs.*, 489 U.S. 602, 635 (1989) (Marshall, J., dissenting). The seizure of Mr. Coley's backpack was unreasonable.

**C.**   **Defendants Decision to Destroy Coley's Backpack Makes the Seizure Unreasonable and in Violation of the Fourth Amendment.**

Even if the initial taking of Mr. Coley's backpack is not considered a violation of the Fourth Amendment, the Defendants' decision to immediately destroy all property and permanently deprive Mr. Coley of his personal property makes the seizure unreasonable. "[A] seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005) *citing United States v. Jacobsen*, 466 U.S. 123 (1984); *see Lavan v. City of L.A.*, 693 F.3d 1022, 1030 (9th Cir. 2012) ("[E]ven if the seizure of the property would have been deemed reasonable had the City held it for return to its owner instead of immediately destroying it, the City's destruction of the property rendered the seizure unreasonable.").  Here, the immediate destruction by Defendants permanently deprived Mr. Coley of his backpack.  This is the sort of violation the Fourth Amendment is supposed to protect against.  The destruction of Mr. Coley's backpack was unreasonable.

**II.**   **DEFENDANTS VIOLATED COLEY'S FIFTH AMENDMENT RIGHT TO PROCEDURAL DUE PROCESS WHEN DEFENDANTS FAILED TO PROVIDE ADEQUATE NOTICE AND ANY HEARING PRIOR TO THE DESTRUCTION OF COLEY'S BACKPACK.**

**A.**   **Defendants Did Not Provide Any Notice to Coley that His Backpack Would be Seized and Destroyed.**

The Fifth Amendment provides in pertinent part that "No person shall . . . be deprived of life, liberty, or property, without due process of law . . . ."  U.S. CONST. amend. V.  "[D]ue process is flexible and calls for such procedural protections as the particular situation demands."  *Morrissey v. Brewer*, 408 U.S 471, 481 (1972).  To determine what procedures may be due "generally requires consideration of three distinct

factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest . . . ." *Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976).

Applying these factors in reverse order makes the most sense. Defendants argue that the government interest is public health and security; however, Plaintiff alleged facts to support the conclusion that this was mere pretext for removal of all protestors and their belongings from BLM Plaza in such a way as to assuage the Trump Administration and send a message to BLM protestors that the creation of an autonomous zone would not be tolerated by the District. (Compl. ¶ 48). On a motion to dismiss, all inferences are drawn in favor of Plaintiff.

Next, the risk of erroneous deprivation is high, because the purpose was to remove all protestors and their belongings. But the area harbored a large population of people who were not protestors. Indeed, by painting the Black Lives Matter mural, Defendant Bowser encouraged citizens to gather in BLM Plaza. (Compl. ¶ 36). People who were not protestors did gather in BLM Plaza. For example, Earl's First Amendment Grill, a pop-up restaurant, had been feeding between 400 and 500 people a day for free, providing food to passersby and people experiencing homelessness. (Compl. ¶ 40). Protestors dominated the area in the evenings, yet, by deciding to clear the area out at 3:00pm, it would be significantly more likely that innocent people would become targeted by the government action.

Lastly, the private interest is a person's possessory interest over their personal property. People do not expect for the government to seize their property while walking on the public street.

Taken together, the District had an obligation to provide notice to innocent people when it contemplated aggressive encampment clearing action, which it could have provided in various cost-effective ways. The District could have complied with its own protocols to provide actual posted signs and placards around the area. The District could have stationed personnel that would inform individuals entering BLM Plaza that an encampment clearing operation was contemplated or underway. In fact, some MPD officers were already in the Plaza prior to the show of force. Instead, the District did none of these things, because the District wanted to send a message to the protestors through its show of force and destruction of protestors' property. (Compl. ¶ 48).

Defendants now argue that notice had been provided to Mr. Coley, because an interagency team had talked to people staying on H Street, the District cleared the area that morning, and Mr. Coley spoke with someone who had been pepper-sprayed while sitting in a tent on public space. (Def. D.C. Mot. to Dismiss, p. 13). None of this can be considered sufficient notice.

First, the initial encampment clearing commenced at approximately 10:00am on June 23, 2020. That morning, the District's target was the area surrounding St. John's Church on H Street, not the intersection of 16th Street NW and K Street NW, two-blocks away. It is for this reason that Defendant Turnage emailed the DCist to report "we deployed our interagency team to talk with the people staying on H Street," (Compl. ¶ 53), and not on BLM Plaza. By 1:15pm, the District completed the encampment clearing

operation. (Compl. ¶ 63). There was no reason for Mr. Coley to believe that where he stood, five hours later and two blocks away would be within the zone of a new or continued encampment clearing operation. Instead Defendants argue that a pepper sprayed BLM protestor is the District's notice of an imminent encampment clearing operation to satisfy due process, which obviously is deficient, e.g., it only shows what the District had done that morning, but not what they were planning to do.

**B.    Defendants Did Not Provide a Hearing Prior to the Destruction of Coley's Backpack.**

"[I]t has become a truism that '*some* form of hearing' is required before the owner is finally deprived of a protected property interest." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 433 (1982); *see Propert v. District of Columbia*, 948 F.2d 1327, 1333 (D.C. Cir. 1991) ("[S]ome kind of hearing" was necessary before the District ordered the destruction of an allegedly abandoned vehicle.). "If the right to notice and a hearing is to serve its full purpose, then, it is clear that it must be granted at a time when the deprivation can still be prevented." *Fuentes v. Shevin*, 407 U.S. 67, 81 (1972).

It is clear that Defendants offered no hearing to Mr. Coley prior to the destruction of Mr. Coley's backpack, and Defendants do not claim they did so. Instead, Defendants argue, "Because state court is available to address Coley's claimed deprivation, the taking of his unattended backpack does not rise to the level of a constitutional violation and his Fifth Amendment claim fails against the District." (Def. D.C. Mot. to Dismiss, p. 14). But Defendants inappropriate rely on a case from the District of Massachusetts about the emergency demolition of a building damaged by a tornado—plaintiffs believed the building was salvageable; defendants disagreed—holding, "A mere mistake by officials in exceeding the limits of their authority is not the stuff of a federal due process claim.

Painful as the demolition may have been for Plaintiffs, a 'mere mistake' is the most that any jury could find happened here." *S. Commons Condo. Ass'n v. City of Springfield*, 967 F. Supp. 2d 457, 460 (D. Mass. 2013). But that case is inapposite, because Mr. Coley is not alleging that Defendants made a mere mistake, rather Defendants planned to remove protestors and their personal property for political reasons intentionally depriving all protestors of their constitutional rights. (Compl. ¶ 48). There was no mistake when Mr. Coley begged MPD officers to return his bag, and not one would help.

As *Logan v. Zimmerman* makes clear, "absent 'the necessity of quick action by the State or the impracticality of providing any predeprivation process,' a post-deprivation hearing here would be constitutionally inadequate." 455 U.S. at 436 *quoting Parratt v. Taylor*, 451 U.S. 527, 539 (1981). It was not impractical to provide a predeprivation process in this case. Mr. Coley begged MPD officers not to take his backpack, to return it, and tried to tell them that the bag was important, because it contained all of his important documents. (Compl. ¶ 81). This is one backpack of obvious value. All MPD officers had to do was separate out Mr. Coley's backpack from the pile of seized property. MPD officers could have sent it to Adams Place for collection by Mr. Coley at a later date, which is what is done for unattended but clearly important possession. Instead, an MPD officer told Mr. Coley, "Forget the F*****g bag, it's F*****g gone. You're not getting it back." (Compl. ¶ 87).

*Logan* goes further to explain a post-deprivation state court hearing is constitutionally inadequate when the deprivation will be permanent. "[A] post-deprivation hearing here would be constitutionally inadequate. That is particularly true where, as here, the State's only post-termination process comes in the form of an

independent tort action. Seeking redress through a tort suit is apt to be a lengthy and speculative process, which in a situation such as this one will never make the complainant entirely whole . . . ." 455 U.S. at 436-37. While some of the items in Mr. Coley's backpack are replaceable, the loss of his cell phone with its photos, videos, and memories can never be recovered and are lost forever. (Compl. ¶ 91). Therefore, the injury is not redressable as Mr. Coley cannot be made entirely whole.

### III. DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY, BECAUSE DEFENDANTS VIOLATED COLEY'S CONSTITUTIONAL RIGHTS AND THESE CONSTITUTIONAL RIGHTS ARE CLEARLY ESTABLISHED.

Defendants argue in their motion to dismiss that there was no constitutional violation and alternatively that the constitutional right was not clearly established. (Defs.' Mot. to Dismiss, pp. 8-11). Both of these conclusions are incorrect.

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). There are two, non-sequential discrete inquiries to be considered in resolving government immunity claims, resolution in favor of the government official of either perfects the claim: "First, a court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right; second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id.* at 232. "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates the law." *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015) (citation omitted). Qualified immunity protects "all but the

plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). The question to be answered is "whether the violative nature of particular conduct is clearly established." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). "Somewhat more concretely, whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the objective legal reasonableness of the action." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (quotation marks omitted).

For the reasons discussed above, Mr. Coley has already alleged violations of his Fourth and Fifth Amendment constitutional rights.

Turning to the second prong analysis to this case, i.e., whether the rights are "clearly established," the dispositive question is an objective one, whether a reasonable government official could have believed that the warrantless seizure by taking and destruction combined with a lack of notice and pre-deprivation hearing could be lawful, in light of clearly established law and the information the official possessed. *See id.* at 642 (for an example applied to an FBI agent who conducted a warrantless search of a family home). Mr. Coley rests primarily on the analysis explaining Fourth and Fifth Amendment violations, above, but notes that this is not the sort of case that should pose supremely difficult hypotheticals as to whether a seizure occurred. MPD officers took Mr. Coley's backpack while he was standing a few feet away. (Compl. ¶ 78). Mr. Coley told them he owned the backpack and asked for it back. (Compl. ¶ 81). The backpack was never unattended. It smacks of hypocrisy to separate a person from their belongings and then claim that person's belongings were now unattended.

Yet on this motion to dismiss, defendants improperly argue that the court should preference Defendants' characterization of Defendants' actions, as ordinary activities undertaken to promote health and safety during an emergency situation, over Plaintiff's allegation that these actions covered Defendants' true desire to send a message to protestors and appease the Trump Administration. See *Bloem v. Unknown Dep't of the Interior Employees*, 920 F. Supp. 2d 154 (D.D.C. 2013) cited and relied upon by Defendants in their motions to dismiss, in which the parallels to the instant case become immediately apparent.

*Bloem* is a *Bivens* case[4] where the National Park Service and the United States Park Police cleared Occupy DC protestors from McPherson Square, seizing and immediately destroying personal property. *Bloem v. Unknown Dep't of the Interior Employees*, 920 F. Supp. 2d at 157. Similar to the arguments made in this opposition, that court determined that a Fourth and Fifth Amendment violation had been pled, *id.* at 162-63, and that defendants were not entitled to qualified immunity at the motion to dismiss stage, where "the officials' claims of qualified immunity hardly present 'purely legal' issues capable of resolution 'with reference only to undisputed facts.' Cases fitting that bill typically involve contests not about what occurred, or why an action was taken or omitted, but disputes about the substance and clarity of pre-existing law," *id.* at 166 *quoting Ortiz v. Jordan*, 562 U.S. 180, 190 (2011).

As alleged in the complaint, the purpose for the Defendants' meeting on or about June 22nd and 23rd was to respond to renewed threats by the Trump Administration over

_____

[4] See *Butz v. Economou*, 438 U.S. 478, 504 (1978), holding it is "untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials."

the seizure of operational control of the MPD, (Compl. ¶¶ 45-48), not over a concern that people camped out and around BLM Plaza. People congregated in BLM Plaza and erected tents as far back as June 5th, ever since Defendant Bowser ordered the painting of the Black Lives Matter mural. (Compl. ¶ 39). Why now did the Bowser Administration decide to act?

Additionally, the intersection at 16th Street, NW, and K Street, NW, looked and felt very different from the area surrounding St. John's Church on H Street, NW. While H Street experienced fires, (Compl. ¶¶ 30, 32), spray painting, (Compl. ¶¶ 42-44), and other violent interactions between protestors and government officials next to St. John's Church, this happened because of the proximity to the White House. That is the area where protestors sought to found the Black House Autonomous Zone, not two blocks away at the 16th Street and K Street intersection.

A reasonably objective government official would have known a warrantless seizure and destruction of property, combined with a lack of notice and predeprivation hearing would violate the Fourth and Fifth Amendments, because that government official would know that responding to a political crisis brought upon by the Trump Administration's threatened and lawful exercise of the Home Rule Act could not be the basis for an emergency encampment clearing. Reacting to the Trump Administration is fundamentally different from clearing a homeless encampment that presents a public nuisance.

## IV.    THE COURT SHOULD NOT DISMISS COLEY'S OFFICIAL CAPACITY CLAIMS AGAINST DEFENDANTS, BECAUSE THE DISTRICT OF COLUMBIA IS NOT A NAMED DEFENDANT.

It is true that an official capacity suit represents "another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S.

159, 165-66 (1985). However, the entity does not become an "indispensable" party simply because it may need to indemnify the agent in future, "any more than an insurance company must be included as a defendant in a suit against its insured." *Askew v. Sheriff of Cooks County*, 568 F.3d 632, 637 (7th Cir. 2009). In this case, the District of Columbia is not a named defendant, therefore dismissal of Coley's official capacity claims against the Defendants should be denied. *Cf., e.g.*, *Cotton v. District of Columbia*, 421 F. Supp. 2d 83, 86 (D.D.C. 2006) (Dismissal would be proper where the District of Columbia is a named defendant and the defendant was sued in his individual capacity only.).

Moreover, the concerns of inefficient use of judicial resources due to redundancy of duplicative cases does not apply here, where all of the Defendants have been named in their personal capacities as well as their official capacities. Defendants would all still be named parties to the lawsuit. And for purposes of the instant motion, consider: only one motion needed to be filed instead of the two filed by opposing counsel. All of the defendants are represented by the DC Attorney General's Office. While certain official capacity claims may not survive past discovery, retaining these Defendants simplifies the process of evaluating each of the complained of activities by examining each Defendant against their actions.

**V.    THE COURT SHOULD NOT DISMISS COLEY'S COMMON LAW TORT CLAIMS, BECAUSE COLEY ALLEGED SPECIFIC, INTENTIONAL OR RECKLESS ACTIONS BY DEFENDANTS TO SEIZE AND DESTROY BLM PROTESTOR PROPERTY.**

The only issue Defendants argue in opposing Coley's common law claims against Defendants is that these claims must show intentional misconduct, but conflates the intention or recklessness to cause distress with a requirement that the intention be

directed at a plaintiff—"Coley pleads no facts showing that any defendant was present when MPD or DPW employees removed and destroyed his unattended bag. Nor does he plead facts showing that these defendants knew him, knew that he would be at Black Lives Matter Plaza on June 23, 2020, or that they knew that Coley would leave his property unattended and that it would be taken and destroyed." (Defs.' Mot. to Dismiss p. 12). In *Kurd v. Republic of Turkey*, for example, the Court found that Defendants had engaged in intentional extreme and outrageous conduct when defendants threatened plaintiffs' fellow protestors and friends, but not them specifically. 374 F. Supp. 3d 37, 55 (D.D.C. 2019). Moreover, defendants seemingly ignore that the complaint names Four Unidentified MPD officers and At Least Three Unidentified Department of Public Work Employees as defendants in both their official and individual capacities and charges them with violations of Counts III, IV, and V. (Compl. ¶¶ 25-26). These are the MPD officers and DPW employees that directly interacted with Mr. Coley and seized and destroyed his backpack.

**A.** **Coley Properly Pled Count III: Intentional Infliction of Emotional Distress.**

The elements for an intentional infliction of emotional distress claim consists of "(1) 'extreme and outrageous' conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff 'severe emotional distress.'" *Howard Univ. v. Best*, 484 A.2d 958, 985 (D.C. 1984). "Extreme and outrageous conduct is defined as conduct so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Conduct will be sufficient to sustain a claim for intentional infliction of emotional distress if the recitation of the facts to an average member of the

community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Kurd*, 374 F. Supp. 3d at 53.

Coley alleged that Defendants conspired together to remove protestors located in Black Lives Matter Plaza, deprive them of their personal property, and immediately destroy that property to send a message to protestors and to appease the Trump Administration. (Compl. ¶ 48). Defendants ordered MPD officers not to listen or engage with the public during the encampment removal operation. Mr. Coley begged the MPD officers not to take his bag, and to allow him to retrieve it. No MPD officer would help Mr. Coley and other MPD officers chastised the one MPD bike officer that listened to Mr. Coley. (Compl. ¶¶81, 83). The Defendants wanted to send a message to protestors, and did so in a way to maximize the effect of their message—the District controls its streets. (Compl. ¶ 62). The decision not to comply with the District's own encampment clearing protocols further indicates the intention or recklessness by Defendants. The Defendants embarrassed Mr. Coley—they took away Mr. Coley's dignity and his chance to get back on his feet after Defendant Bowser's Stay-At-Home Orders. For these reasons, Coley properly pled his intentional infliction of emotional distress claim against Defendants.

**B.     Coley Properly Pled Count IV: Conversion.**

For the tort of conversion a plaintiff must allege the defendant's "intentional exercise of dominion or control over a chattel, which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." *Edmonds v. United States*, 563 F. Supp. 2d 196, 202 (D.D.C. 2008). Defendants created a plan to seize protestors' property at Black Lives Matter Plaza and immediately destroy it. (Compl. ¶ 48). The seizure of Mr. Coley's backpack by MPD officers and subsequent destruction seriously interferes with Mr. Coley's right to exercise

his dominion and control over his bag. For these reasons, Coley properly pled conversion against the Defendants.

### C. Coley Properly Pled Count V: Civil Conspiracy.

Defendants only argue that Coley's civil conspiracy claim must fail, because each of the underlying torts of intentional infliction of emotional distress and conspiracy were improperly pled. For the reasons already discussed, those counts were properly pled. While it is true that there "is no recognized independent tort action for civil conspiracy in the District of Columbia," *Waldon v. Covington*, 415 A.2d 1070, 1074 n. 14 (D.C.1980), "rather, it is a means for establishing vicarious liability for the underlying tort," *Halberstam v. Welch*, 705 F.2d 472, 479 (D.C. Cir. 1983). The application to the instant case is that even if the Court ruled that Defendants could not be held to be liable for either the intentional infliction of emotional distress or conversion claim, the fact that Defendants Four Unidentified Metropolitan Police Officers and At Least Three Unidentified Department of Public Works Employees could be liable, then civil conspiracy would provide the basis for vicarious liability for the remaining Defendants, based upon the satisfaction of the elements of the tort of civil conspiracy.

To allege civil conspiracy, there must be "(1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; and (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement (4) pursuant to, and in furtherance of, the common scheme." *Weishapl v. Sowers*, 771 A.2d 1014, 1023 (D.C. 2001) (internal citations omitted). Here, the agreement is an employment agreement between the unidentified MPD officers and DPW employees and their employer represented by Defendants Bowser, Newsham, and Geldart, in their official capacity as the Mayor, Chief of Police, and Acting Director of the

Department of Public Works, respectively.  The employment agreement requires that employees comply with orders by their employers, and in the instant case, Defendants ordered the MPD officers to commit the tort of either conversion or the intentional infliction of emotional distress by seizing Mr. Coley's backpack.  The seizure and destruction of Mr. Coley's property by MPD officers and DPW employees harmed Mr. Coley, which is what Defendants directed the MPD officers and DPW employees to do. Consequently, the civil conspiracy count is properly pled.

## VI.     THE COURT SHOULD ASSERT SUPPLEMENTAL JURISDICTION OVER COLEY'S COMMON LAW CLAIMS.

So long as Coley's Fourth and Fifth Amendment claim have not been dismissed by the Court, the Court should continue to assert supplemental jurisdiction over Coley's common law claims.

## CONCLUSION

For these reasons, Plaintiff respectfully requests that this Court grant Defendants' Motion to Dismiss for claims arising from the Fourteenth Amendment and deny Defendants' Motion for all other claims.  Plaintiff also requests an oral hearing under Local Rule 7(f).

Dated: October 1, 2020                              Respectfully submitted,


/s/ Jonathan K. Gitlen
Jonathan K. Gitlen


Jonathan K. Gitlen (D.C. Bar No. 990918)
Law Office of Jonathan K. Gitlen PLLC
900 19th Street, NW, Fifth Floor

Washington, DC 20006
Tel.: (202) 568-5788
Fax: (202) 301-8556
Email: jonathan.gitlen@jgitlenlaw.com

*Attorney for Plaintiff Dionte Coley*