**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| DIONTE COLEY,<br>    Plaintiff<br>    v.<br>MURIEL BOWSER, *et al.*,<br>    Defendants | Civil Action No. 20-2182 (CKK) |

**MEMORANDUM OPINION**
(April 22, 2021)

Dionte Coley ("Plaintiff") has filed a civil action against Muriel Bowser, Peter Newsham, Karl Racine, Christopher Geldart, Laquandra Nesbitt, and Wayne Turnage (collectively, the "Moving Defendants"), as well as "Four Unidentified Metropolitan Police Officers" and "At Least Three Unidentified Department of Public Works Employees," (collectively, with the "Moving Defendants," "Defendants"). Plaintiff's complaint asserts five counts against each Defendant, in both their individual and official capacities. In Counts I and II, Plaintiff asserts claims under 42 U.S.C. § 1983 for alleged deprivations of his Fourth, Fifth, and Fourteenth Amendment rights, respectively. In Counts III, IV, and V, Plaintiff asserts common law claims against each Defendant for intentional infliction of emotional distress, conversion, and civil conspiracy.

Now pending before the Court, is the Motion to Dismiss of the Moving Defendants. Upon consideration of the briefing, the relevant authorities, and the record as a whole,[1] the Court will **GRANT IN PART** and **DENY IN PART** the Moving Defendants' Motion. Specifically, the

---

[1] The Court's consideration has focused on the following briefing and material submitted by the parties:
- Compl., ECF No. 1;
- District of Columbia's Mem. of P. & A. in Supp. of Mot. to Dismiss, ECF No. 9;
- Defs.' Mem. of P. & A. in Supp. of Mot. to Dismiss ("Def.'s Mot."), ECF No. 10;
- Pl.'s Mem. of P. & A. in Opp'n to Defs.' Mot. to Dismiss ("Pl.'s Opp'n"), ECF No. 11; and,
- Defs.' Reply to Pl.'s Opp'n, ECF No. 13.

In an exercise of its discretion, the Court finds that holding oral argument in this action would not be of assistance in rendering a decision. *See* LCvR 7(f).

Court will **GRANT** the Moving Defendants' Motion, to the extent it seeks dismissal of Counts I through V against the Moving Defendants in their *individual* capacities. The Court, however, will **DENY WITHOUT PREJUDICE** the Moving Defendants' Motion, to the extent it seeks dismissal of Counts I through V against the Moving Defendants in their *official* capacities.

## I.   BACKGROUND

The Court sets forth the relevant factual background below. At the pleading stage, the Court's factual background derives from the factual allegations in Plaintiff's complaint. *See Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 314–15 (D.C. Cir. 2014). The Court, however, does not adopt any of Plaintiff's factual allegations or make any factual findings at this stage of the proceedings.

### A.  Black Lives Matter Plaza

Following the tragic death of George Floyd in May 2020, "Black Lives Matter Plaza" in Washington, D.C. became a focal point for national protest movements and political tension. *See* Compl. ¶¶ 27–36. Located across from Lafayette Square on 16th Street, between K Street and H Street, Northwest, the plaza developed into a bustling enclave filled with protesters participating in racial justice demonstrations. *See id.* ¶¶ 27, 40. The plaza also contained numerous homeless individuals, tents and personal property in the middle of the street, medic stations, and even a pop-up restaurant serving the nearby population. *Id.* By June 2020, protesters and demonstrations within the plaza garnered the close attention of then-President Donald Trump. *See id.* ¶¶ 30–32. In light of these demonstrations, then-President Trump activated federal law enforcement officers and allegedly threatened to assume control of the Metropolitan Police Department of the District of Columbia ("MPD") to address emerging public safety concerns in the area. *See id.* ¶¶ 30–35.

On June 22, 2020, the events surrounding Black Lives Matter Plaza reached a crescendo. Local protesters entered Lafayette Square and attempted to remove a statue of Andrew Jackson, *id.* ¶ 41, and, later that night, attempted to establish an "autonomous zone" around the historic St. John's Church. *See id.* ¶ 42. In response, then-President Trump proposed a forceful intervention by federal law enforcement officers to impede the protesters' activities. *See id.* ¶¶ 45–47. In turn, District of Columbia officials became concerned about the destabilizing effects of an autonomous zone in Black Lives Matter Plaza, as well as then-President Trump's related proposal to federalize local law enforcement. *See id.* ¶ 48. To address these potential sources of unrest, Mayor Muriel Bowser promptly "convened a meeting" on June 22nd "with her top administration officials to determine the appropriate steps to resolve the [autonomous zone] situation and appease the White House." *Id.* Plaintiff alleges that either the Moving Defendants themselves or "representatives" from their respective agencies attended this meeting and "offered their views on the best ways to respond to Presidential pressure" over the protests. *Id.* ¶ 49. Plaintiff, however, does not make any concrete allegations about who specifically attended the June 22nd meeting or what any particular individual said or did during the meeting. *See id.* ¶¶ 48–50. Plaintiff does allege, however, that Mayor Bowser ultimately "decided to order the removal of the protesters" to prevent the creation of an autonomous zone and to preserve public safety. *Id.* ¶ 50. The District of Columbia declared the large enclaves of tents and personal property in the middle of the street within Black Lives Matter Plaza to be "encampments," which posed a threat to public safety and were subject to removal. *See id.* ¶¶ 53–55.

On June 23, 2020, District of Columbia officials carried out this encampment removal within Black Lives Matter Plaza. The first clearing occurred at approximately 1:00 PM ET, focusing on the area of the plaza closer to H Street, Northwest. *See id.* ¶¶ 58–63. A second clearing

then occurred closer to K Street, Northwest, around 3:00 PM ET that afternoon.  *See id.* ¶ 64.  To clear these encampments, MPD officers removed protesters from the plaza and gathered abandoned property from the street and sidewalks for confiscation.  *See id.* ¶¶ 51, 82.  Then, MPD officers and officials from the Department of Public Works ("DPW") deposited the collected property into garbage trucks for transport and disposal at a trash dump in Virginia.  *See id.* ¶ 84.

Plaintiff alleges that the District of Columbia has authority to clear encampments to promote public safety, but in doing so, it traditionally follows certain procedures, which provide for advance notice and the preservation of valuable property.  *See id.* ¶¶ 56–57.  Plaintiff alleges, however, that the District of Columbia did not follow these procedures when carrying out the June 23, 2020 encampment clearings in Black Lives Matter Plaza.  *Id.* ¶ 57.  For example, Plaintiff alleges that District of Columbia officials failed to post signs warning of the removal of property around the encampment site.  *See, e.g.*, ¶¶ 56, 60.  Moreover, the District of Columbia allegedly failed to deploy intervention personnel into the encampment site to provide appropriate guidance to homeless individuals within the area.  *See id.*  Relatedly, the District of Columbia did not provide storage containers for the preservation of eligible property, *see id.* ¶ 57, nor did the District of Columbia provide individuals with information regarding how to retrieve their eligible property after the removal, *see id.* ¶ 60.  Instead, the June 23, 2020 removal operation at Black Lives Matter Plaza allegedly permitted MPD officers to throw "all of the personal property" seized "into the trash."  *Id.* ¶ 59.  Nonetheless, the District of Columbia's encampment protocol makes clear that "[d]ue to safety and other concerns . . . [o]nly eligible property in plain sight, without manipulation, will be stored."  Encampment Protocol at 8.[2]  The encampment protocol further states that it "does

---

[2] The District of Columbia's encampment protocol procedures are incorporated into Plaintiff's complaint by reference.  *See* Compl. ¶ 56; *Strumsky v. Washington Post Co.*, 842 F. Supp. 2d 215, 217–18 (D.D.C. 2012) (discussing incorporation by reference at the pleading stage).  The protocol procedures may be

not create any enforceable third party rights on behalf of any member of the public or any individual whose property may be the subject of this protocol." *Id.* at 1.

## B.  Plaintiff's Personal Experience At Black Lives Matter Plaza

Plaintiff is a professional cook, residing in Washington, D.C.  *See* Compl. ¶ 4.  In March 2020, the COVID-19 pandemic forced restaurants in Washington, D.C. to close, reducing Plaintiff's immediate employment prospects.  *See id.* ¶ 65.  Accordingly, Plaintiff decided to place his belongings in a local storage unit and temporarily move in with family in Raleigh, North Carolina, until Washington, D.C. restaurants re-opened.  *See id.*  After spending several months in North Carolina, Plaintiff learned that Washington, D.C., restaurants would re-open on June 22, 2020.  *See id.* ¶ 66.  With renewed hopes of finding work, Plaintiff promptly planned his return to Washington, D.C.  *See id.*  Plaintiff purchased a bus ticket for his return trip and arranged for an apartment rental in the city.  *See id.*  To transport his personal effects, Plaintiff packed a single black backpack with his cell phone, three sets of clothes, his social security card, his birth certificate, his financial documents and certifications, $800 in cash to pay for rent, and the key for his Washington, D.C. storage locker.  *Id.* ¶ 5.

Plaintiff arrived back in Washington, D.C. on the evening of June 22, 2020.  *See id.* ¶ 67.  That night, Plaintiff stayed with a close friend who lived near the intersection of 11th Street and P Street, Northwest.  *See id.*  The following day Plaintiff departed from his friend's residence and proceeded towards Northeast, where he intended to reconnect with family and friends in the area. *Id.* ¶ 68.  Hoping to catch an eastbound bus to his destination, Plaintiff made his way to the bus stop at the corner of 16th Street and K Street, Northwest.  *See id.* ¶ 72.  As he neared the bus stop,

---

accessed     here:     https://dmhhs.dc.gov/sites/default/files/dc/sites/dmhhs/page_content/attachments/ Encampments%20Protocol_12.13.19.pdf.

around approximately 2:30 PM ET, Plaintiff noticed "a large group of people in the area, some milling about and some sitting in tents." *Id.* "It was only when [Plaintiff] got closer to the bus stop" that he realized he was in "Black Lives Matter Plaza." *Id.* Plaintiff, who had just arrived in Washington, D.C. the night before, was unaware of the June 22nd events regarding the Andrew Jackson statue or the creation of an autonomous zone outside of St. John's Church. *See id.* ¶ 73. Plaintiff was also unaware that District of Columbia officials had cleared an "encampment" near H Street, earlier that afternoon. *See id.* Plaintiff had not passed any signs or received any warnings informing him that the area around Black Lives Matter Plaza had been designated as an encampment or that a related police operation was ongoing that day. *See id.* ¶ 74.

Plaintiff continued to wait at the 16th Street and K Street bus stop for the arrival of an eastbound bus. *See id.* ¶ 75. While waiting for the bus, Plaintiff noticed a pedestrian "rubbing his face, eyes, and hair with milk." *Id.* ¶ 76. The pedestrian informed Plaintiff that the police had used pepper spray on protesters in the area, but that "everything had calmed down." *Id.* The pedestrian then invited Plaintiff "to sit in [his] tent to get out of the sun while waiting for the bus, and offered [Plaintiff] a bottle of water." *Id.* Plaintiff accepted the offer. *Id.* After finishing the water and realizing that his bus would not arrive for another twenty minutes, Plaintiff then decided to have a cigarette to pass the time. *See id.* ¶ 77.

Before smoking, Plaintiff set his backpack down and "moved a few steps away from his bag so his smoke would not bother anyone." *Id.* But just as Plaintiff stepped away from his backpack, "over [one] hundred MPD officers swarm[ed] the area" in a sudden and "overwhelming show of force," screaming "MOVE and GET THE F*** OUT OF THE WAY!" *Id.* ¶ 78. The MPD officers "advanced with a line of officers moving like a Roman phalanx against the wall of the southwest corner of the intersection of 16th Street and K Street." *Id.* "At least two officers

shoved [Plaintiff], and at least twelve police officers cornered him against the building in the southwest corner of the intersection." *Id.* "The police let no one they surrounded leave, and they separated [Plaintiff] from his backpack." *Id.* The MPD officers then threw all of the items collected from the "encampment," including Plaintiff's backpack, "into a pile in[] the intersection of 16th Street and K Street." *Id.* ¶ 82. The pile of confiscated items "was surrounded and protected by MPD officers." *Id.*

Plaintiff attempted to explain to the officers that he was not a protester and was "in desperate need of [his] backpack," which "contained all of his important documents and possessions." *Id.* ¶ 81. But Plaintiff's appeal for help was unsuccessful, *see id.* ¶¶ 81–87, and, shortly thereafter, MPD officers and DPW employees arrived to throw the confiscated items into a garbage truck for removal, *see id.* ¶ 84. These MPD and DPW officials "made no efforts to examine the personal belongings taken," nor did they preserve valuable property seized from the plaza. *Id.* ¶ 86. As a result, Plaintiff was permanently dispossessed of his backpack, which contained his phone, his money for rent, the key to his storage locker, and his clothing. *See id.* ¶ 89. Plaintiff also lost the personal identification documents within his backpack (*i.e.*, his social security card and birth certificate), directly impeding his ability to provide employment verification when applying for jobs. *See id.* ¶ 92. Plaintiff is now homeless and destitute, with no clear avenue through which to recover the items stored within his confiscated backpack. *See id.* ¶¶ 15–16.

## C. Procedural History

Based on the events described above, Plaintiff filed a five-count complaint on August 11, 2020, against: (1) District of Columbia Mayor, Muriel Bowser, (2) MPD Chief of Police, Peter Newsham, (3) District of Columbia Attorney General, Karl Racine, (4) Acting Director of DPW,

Christopher Geldart, (4) Director of the District of Columbia Department of Health, Laquandra Nesbitt, and (5) Deputy Mayor for District of Columbia Health and Human Services, Wayne Turnage. *See id.* ¶¶ 19–24 (collectively, the "Moving Defendants"). Plaintiff's complaint also names as Defendants, "Four Unidentified Metropolitan Police Officers" and "At Least Three Unidentified Department of Public Works Employees." *Id.* ¶¶ 25–26. Plaintiff asserts five causes of action against each Defendant in both their individual and their official capacity. In Counts I and II, Plaintiff asserts claims under 42 U.S.C. § 1983 for alleged deprivations of his Fourth, Fifth, and Fourteenth Amendment rights, respectively. *See* Compl. ¶¶ 97–115. In Counts III, IV, and V, Plaintiff asserts common law claims against each Defendant for intentional infliction of emotional distress, conversion, and civil conspiracy. *See id.* ¶¶ 116–37.

On September 18, 2020, the Moving Defendants filed a motion to dismiss each count asserted against them in Plaintiff's complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6). *See* Defs.' Mot. at 1. Plaintiff opposes this motion, and the parties have now fully briefed the issues raised therein. Accordingly, the Moving Defendants' Motion to Dismiss is ripe for this Court's review.

## II.    LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a complaint on the grounds that it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "[A] complaint [does not] suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). Rather, a complaint must contain sufficient factual allegations that, if accepted as true, "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "When ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Atherton v. D.C. Off. of Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009) (quotations omitted).

## III.   DISCUSSION

Plaintiff asserts five counts against the Moving Defendants in both their official and individual capacities. Counts I and II rest on constitutional theories of liability under 42 U.S.C. § 1983 and alleged violations of Plaintiff's Fourth, Fifth, and Fourteenth Amendment rights. Plaintiff's remaining claims, in Counts III, IV, and V, assert common law claims for the intentional infliction of emotion distress, conversion, and civil conspiracy. The Court will address the Moving Defendants' motion to dismiss each of these claims below.

### A.  Fourteenth Amendment Claims

At the outset, the Court finds that Plaintiff's Fourteenth Amendment claims in Counts I and II fail as a matter of law. *See* Compl. ¶¶ 97–115. The Moving Defendants correctly argue that the Fourteenth Amendment applies only to the "States," and is, therefore, inapplicable to the District of Columbia and its employees. *See* Defs.' Mot. at 7; *Kendrick v. United States*, 238 F.2d 34, 36 n.2 (D.C. Cir. 1956) ("The Fourteenth Amendment is not applicable in the District of Columbia."). In response, Plaintiff concedes that "the Fourteenth Amendment does not apply to the District of Columbia and consequently the named defendants." Pl.'s Opp'n at 10 n.2. Accordingly, the Court **DISMISSES** all Fourteenth Amendment claims in Plaintiff's complaint.

### B.  Individual Capacity Claims

Next, the Court will consider Plaintiff's remaining individual capacity claims against the Moving Defendants in Counts I through V. For the reasons set forth below, the Court concludes

that Plaintiff has failed to adequately plead his § 1983 claims and common law claims against any of the Moving Defendants in their individual capacities.

### 1. Counts I and II – Section 1983 Claims

In Counts I and II of the complaint, Plaintiff asserts constitutional tort claims under 42 U.S.C. § 1983 against the Moving Defendants in their individual capacities.  To state an individual capacity claim under § 1983, "a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  *West v. Atkins*, 487 U.S. 42, 48 (1988).  Here, Plaintiff alleges violations of his Fourth and Fifth Amendment rights.  *See* Compl. ¶¶ 97–115.  "The Fourth Amendment protects the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'"  *Turpin v. Ray*, 319 F. Supp. 3d 191, 198 (D.D.C. 2018) (quoting *Payton v. New York*, 445 U.S. 573, 589–90 (1980)).  The Fifth Amendment "prohibits the [] government from depriving any person 'of life, liberty, or property, without due process of law,' and from taking 'private property . . . for public use, without just compensation.'"  *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1265 (D.C. Cir. 2020) (quoting U.S. Const. amend. V).

Plaintiff's Fourth and Fifth Amendment claims against the Moving Defendants in their individual capacities fail for multiple reasons.  First, Plaintiff alleges no facts showing how the Moving Defendants were personally involved in his alleged constitutional injuries.  Instead, Plaintiff asserts that he sustained Fourth and Fifth Amendment deprivations when unnamed MPD officers took his backpack on June 23, 2020 at Black Lives Matter Plaza during an encampment clearing.  *See* Compl. ¶¶ 97–115.  But under § 1983, "[g]overnment officials" like the Moving Defendants, "may not be held liable for the unconstitutional conduct of their subordinates under a

theory of *respondeat superior*." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).   Rather, a plaintiff must plausibly allege "that each Government-official defendant, through the official's *own individual actions*, has violated the Constitution." *Id.* (emphasis added).

In this case, Plaintiff does not offer any allegations that the Moving Defendants themselves had personal involvement with Plaintiff, or even with the unnamed MPD officers who allegedly seized his backpack.   At most, Plaintiff alleges that Mayor Bowser "convened a meeting" in June 2020 to address emergency circumstances unfolding at Black Lives Matter Plaza, Compl. ¶ 48, and that as a result of that meeting, Mayor Bowser and her administration decided to "order the removal of protesters" to prevent the creation of an autonomous zone, *id.* ¶ 50.   In fact, Plaintiff's allegation that the Moving Defendants "*or representatives from their agencies were present*" at this meeting, calls into question whether the Moving Defendants themselves were even directly involved in the encampment clearing policy.   *Id.* ¶ 49 (emphasis added).

Moreover, Plaintiff cannot establish individual capacity claims against the Moving Defendants simply by referencing the District of Columbia's alleged failure to abide by its own encampment protocol.   *See* Compl. ¶¶ 56–60.   To start, the protocol procedures are advisory and do "not create any enforceable third party rights on behalf of any member of the public or any individual whose property may be the subject of this protocol."   Encampment Protocol at 1.   And even if the protocol was binding, Plaintiff fails to provide any factual allegations regarding how any of the Moving Defendants themselves specifically advocated for a policy in derogation of the traditional protocol procedures.   Again, Plaintiff does not allege any facts about what the Moving Defendants specifically said or did, or even whether they were present at the June 2020 policy meeting in question.   *See id.* ¶ 49.   Without more, Plaintiff has not plausibly alleged how the

Moving Defendants violated his Fourth or Fifth Amendment rights through their "own individual actions." *Iqbal*, 556 U.S. at 676.

Finally, Plaintiff's § 1983 claims against the Moving Defendants in their individual capacities also fail to overcome the threshold barrier of qualified immunity. *See Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quotation omitted). "This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition," *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (quotation omitted), and must focus on the "particular conduct" of the government officials in question, *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).

Here, the Moving Defendants alleged conduct involves either attending or sending a representative to a policy meeting to discuss an encampment clearing procedure. *See* Compl. ¶¶ 48–50. Specifically, Mayor Bowser "convened a meeting" to address emergency circumstances, including the development of an autonomous zone in Black Lives Matter Plaza and a potential federal take-over of local law enforcement. *See id.* ¶¶ 40–48. Plaintiff does not allege anything more specific regarding what any particular Moving Defendant said or did at the June 2020 policy planning meeting, or what role they played in the creation of the encampment removal policy implemented at Black Lives Matter Plaza on June 23, 2020. Without more concrete factual allegations, Plaintiff has not demonstrated that any of the Moving Defendants violated "settled

law" under the Fourth or Fifth Amendment, simply by participating in policy discussions geared towards addressing emergent public safety concerns. *District of Columbia v. Wesby*, 138 S. Ct. 577, 591 (2018). Such alleged conduct does not plausibly demonstrate the type of "plainly incompetent" behavior required to overcome the bar of qualified immunity. *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Consequently, the doctrine of qualified immunity further shields each of the Moving Defendants from Plaintiff's individual capacity Fourth and Fifth Amendment claims under § 1983.

### 2.   Counts III, IV, and V – Common Law Claims

Plaintiff's remaining individual capacity claims in Counts III, IV, and V, rest on common law theories of intentional infliction of emotional distress ("IIED"), conversion, and civil conspiracy. *See* Compl. ¶¶ 116–37. These claims also fail as a matter of law.

To start, Plaintiff's Count III asserts a common law claim for IIED against each of the Moving Defendants. *See* Compl. ¶¶ 116–25. To state a claim for IIED, "a plaintiff must show (1) extreme and outrageous conduct on the part of the defendants, which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." *Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1260 (D.C. 2016) (quotations omitted). The alleged conduct supporting the IIED claim "must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.*

Plaintiff has not satisfied this common law standard, as to the Moving Defendants in their *individual* capacities. In his complaint, Plaintiff alleges that the Moving Defendants met to discuss the emergency circumstances unfolding at Black Lives Matter Plaza in June 2020. *See* Compl. ¶¶ 48–50. Nowhere, however, does Plaintiff allege that any Moving Defendant had an awareness of Plaintiff at the plaza, let alone direct contact with him at the time of his alleged injury. *See id.* ¶¶

78–88.   Absent such a connection, it is not plausible that the Moving Defendants could have intentionally or recklessly caused Plaintiff severe emotional distress.  Indeed, the Court has found no support for such a derivative common law claim, which would allow for IIED liability against a municipal official with no personal awareness of the plaintiff in question.  To the contrary, courts consistently require some direct connection between the IIED defendant and the plaintiff upon whom they allegedly inflict severe emotional distress.  *See, e.g.*, *Kurd v. Republic of Turkey*, 374 F. Supp. 3d 37, 55 (D.D.C. 2019) (finding a plausible IIED claim against defendants who "directed" their actions towards and physically assaulted counter-protesters); *District of Columbia v. Tulin*, 994 A.2d 788, 801 (D.C. 2010) (observing that an "indirect" theory of IIED liability still involved a direct connection between the officer-defendant and the plaintiff).  Plaintiff cites to no countervailing authority.  Against this backdrop, the Court concludes that Plaintiff has failed to plead a plausible IIED claim against the Moving Defendants in their individual capacities.

Next, Plaintiff's common law conversion claim against the Moving Defendants in Count IV falls short for similar reasons.  *See* Compl. ¶¶ 126–31.  "Under District of Columbia law, conversion is defined as an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other full value of the chattel."  *Johnson v. McCool*, 808 F. Supp. 2d 304, 308 (D.D.C. 2011) (quotation omitted); *see also Greenpeace, Inc. v. Dow Chem. Co.*, 97 A.3d 1053, 1063 (D.C. 2014).  To state a viable conversion claim, a plaintiff must demonstrate "that the defendant participated in (1) an unlawful exercise, (2) of ownership, dominion, or control, (3) over the personal property of another, (4) in denial or repudiation of that person's rights thereto."  *McCool*, 808 F. Supp. 2d at 308.  In this case, Plaintiff does not allege that any of the Moving Defendants ever had contact with his backpack or any of his property therein.  *See* Compl. ¶¶ 78–88.  In his

opposition brief, moreover, Plaintiff supports his conversion claim by pointing instead to the role of street-level *MPD officers* in assuming control of his property, not the Moving Defendants themselves.  *See* Pl.'s Opp'n at 27–28 ("The seizure of Mr. Coley's backpack by MPD officers and subsequent destruction seriously interferes with Mr. Coley's right to exercise his dominion and control over his bag.").  Without any allegations that the Moving Defendants themselves exercised control over Plaintiff's property, Plaintiff's common law conversion claim against them in their individual capacities fails as a matter of law.

This leaves only Plaintiff's civil conspiracy claim in Count V against the Moving Defendants.  *See* Compl. ¶¶ 132–37.  Under District of Columbia law, "the elements of a civil conspiracy claim are '(1) an agreement between two or more persons; (2) to participate in an unlawful act, or in a lawful act in an unlawful manner; and (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement (4) pursuant to, and in furtherance of, the common scheme.'"  *Inova Health Care Servs. for Inova Fairfax Hosp. v. Omni Shoreham Corp.*, No. CV 20-784 (JDB), 2020 WL 4201661, at *7 (D.D.C. July 22, 2020) (quoting *Exec. Sandwich Shoppe, Inc. v. Carr Realty Corp.*, 749 A.2d 724, 738 (D.C. 2000)).  A civil conspiracy, however, "is not an independent tort but only a means for establishing vicarious liability for an underlying tort."  *Hill v. Medlantic Health Care Grp.*, 933 A.2d 314, 334 (D.C. 2007).

Here, the Moving Defendants argue that because Plaintiff fails to plead a predicate common law tort claim against the Moving Defendants (*i.e.*, IIED or conversion), Plaintiff's civil conspiracy claim against them must fail as well.  *See* Defs.' Mot. at 11.  The Court is not persuaded by this foundational argument.  "A conspirator need not participate actively in or benefit from the wrongful action in order to be found liable."  *Halberstam v. Welch*, 705 F.2d 472, 481 (D.C. Cir. 1988).  To the contrary, a conspirator may still be liable "regardless of whether they actually

15

committed the tortious act," so long as another party commits the underlying wrongful act in furtherance of their collective agreement. *Nader v. Democratic Nat'l Comm.*, 567 F.3d 692, 697 (D.C. Cir. 2009); *see also Inova Health*, 2020 WL 4201661, at *8 (noting that courts in this district "permit[] civil conspiracy claims to proceed against parties that had no underlying tort asserted against them.").

Plaintiff's complaint presents no allegations regarding a conspiratorial scheme or agreement, involving the Moving Defendants, to specifically harm Plaintiff. At most, Plaintiff alleges that the Moving Defendants discussed and ordered an encampment clearing and the removal of protesters at Black Lives Matter Plaza. *See id.* ¶¶ 48–50, 134. These allegations do not plausibly demonstrate a conspiratorial "agreement" between the Moving Defendants and street-level MPD officials "to inflict a wrong against or injury upon" Plaintiff himself. *Brady v. Livingood*, 360 F. Supp. 2d 94, 104 (D.D.C. 2004). There is a meaningful distinction between an allegedly unconstitutional *policy directive*, dutifully carried out by subordinate officers, and a *genuine agreement* between a government official and his subordinates to wrongfully injure a particular party. *See Graves v. United States*, 961 F. Supp. 314, 320 (D.D.C. 1997) (explaining that an agreement requires a "meeting of the minds"). Plaintiff offers no contrary authority or argumentation in his brief. Accordingly, the Court concludes that, absent any plausible allegations of a common scheme or agreement, Plaintiff's common law conspiracy claim against the Moving Defendants falls short.

## C.  Official Capacity Claims

Finally, the Court will consider Plaintiff's *official* capacity claims against the Moving Defendants in Counts I through V. As a threshold matter, "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office."

*Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989). Therefore, "[a] section 1983 suit for damages against municipal officials in their official capacities is . . . equivalent to a suit against the municipality itself." *Atchinson v. District of Columbia*, 73 F.3d 418, 424 (D.C. Cir. 1996) (citing *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985)). Similarly, "a tort action brought against city officials in their official capacities is equivalent to an action against the city." *Robinson v. District of Columbia*, 403 F. Supp. 2d 39, 49 (D.D.C. 2005); *see also Price v. District of Columbia*, 545 F. Supp. 2d 89, 95–96 (D.D.C. 2008). The Court will, therefore, treat each of Plaintiff's official capacity claims in Counts I through V, as municipal claims against the District of Columbia.[3]

### 1. Counts I and II – Section 1983 Claims

Accepting Plaintiff's allegations as true at the pleading stage, Plaintiff has stated a § 1983 claim against the District of Columbia for violations of his Fourth and Fifth Amendment rights. *See* Compl. ¶¶ 97–115. To state a § 1983 claim for municipal liability (*i.e.*, a *Monell* claim) a plaintiff must demonstrate that "the municipality itself cause[d] the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (citing *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978)). To do so, the plaintiff must sufficiently allege a "predicate constitutional violation" caused by "a custom or policy of the municipality." *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003). For example, the plaintiff may allege that "the municipality or one of its policymakers explicitly adopted the policy that was the moving

---

[3] Plaintiff does not name the District of Columbia as a defendant in this law suit, but makes a point to emphasize that each Defendant has "been named in their personal capacities as well as their official capacities." Pl.'s Opp'n at 25. Plaintiff even argues that because "the District of Columbia is not a named defendant . . . dismissal of [his] official capacity claims against the Defendants should be denied." *Id.* The utility of Plaintiff's argument on this point is unclear. As explained throughout this Memorandum Opinion, Plaintiff's "official capacity" claims *are* claims against the District of Columbia, and the Court will treat them as such. In evaluating these municipal claims, the Court has also considered the arguments presented in the District of Columbia's Motion to Dismiss. *See* ECF No. 9.

force [behind] the constitutional violation" alleged.  *Warren v. District of Columbia*, 353 F.3d 36,

39 (D.C. Cir. 2004) (quotation omitted).  "Municipalities, unlike their officers, have no qualified

immunity from suit under § 1983."  *Richardson v. District of Columbia*, 322 F. Supp. 3d 175, 186

(D.D.C. 2018) (citing *Owen v. City of Independence*, 445 U.S. 622, 650 (1980)).

In this case, Plaintiff points to the June 23, 2020 encampment clearing at Black Lives

Matter Plaza as the municipal policy that caused his alleged Fourth and Fifth Amendment injuries.

*See, e.g.*, Compl. ¶¶ 97–115.  At the motion to dismiss stage, the June 23rd encampment clearing

plausibly qualifies as an official "policy," which was rendered by the District of Columbia and its

policymakers.  *Warren*, 353 F.3d at 39.  Specifically, Plaintiff alleges that Mayor Bowser and her

administration "decided to order the removal of . . . protesters" at Black Lives Matter Plaza, Compl.

¶ 50, and authorize the clearing of "encampments" in the area, *see id.* ¶ 53.  Plaintiff further alleges

that the June 23rd encampment removal policy was adopted by city officials including Chief of

the Metropolitan Police Department Peter Newsham, and the Deputy Mayor for Health and Human

Services Wayne Turnage, "whose office is responsible for the removal of all other encampments

in the city."  *Id.* ¶ 53; *see also id.* ¶¶ 103, 111.  These allegations plausibly demonstrate the "explicit

setting of a policy by the government."  *Baker*, 326 F.3d at 1306.  The Court is also satisfied that

under local law, *see Hamilton v. District of Columbia*, 852 F. Supp. 2d 139, 150 (D.D.C. 2012),

these administrative officials possessed final policymaking authority over encampment

designations and removal actions, sufficient to render the June 23rd encampment removal a

municipal "policy" for the purposes of a *Monell* claim, *see, e.g.*, D.C. Code § 8-741(b); 24 DCMR

§ 121; D.C. Code § 42-3131.01.

Next, Plaintiff plausibly alleges, at least at the motion to dismiss stage, that the District of

Columbia's June 23rd encampment removal policy caused him to suffer Fourth and Fifth

18

Amendment deprivations.  As to the Fourth Amendment, Plaintiff alleges that MPD officers carrying out the June 23rd clearing physically separated Plaintiff from his backpack, while it was only "a few steps away" from him, and then sent the backpack to a trash dump in Virginia.  Compl. ¶¶ 77, 84.  These allegations of a permanent seizure of personal property, absent any showing of continued probable cause or abandonment, plausibly demonstrate an interference with Plaintiff's possessory interest in his backpack and an unreasonable seizure under the circumstances.  *See United States v. Miller*, 799 F.3d 1097, 1102 (D.C. Cir. 2015) ("It is well established that the reasonableness of a seizure turns on the nature and extent of interference with possessory . . . interests."); *Proctor v. District of Columbia*, 310 F. Supp. 3d 107, 114 (D.D.C. 2018) (citing *Lavan v. City of Los Angeles*, 693 F.3d 1022 (9th Cir. 2012)).

The Court acknowledges that the "community caretaking" exception may have justified the seizure of Plaintiff's backpack, given the emergency circumstances at Black Lives Matter Plaza.  *See* Defs.' Mot. at 10 (citing *S. Dakota v. Opperman*, 428 U.S. 364 (1976)).  Nonetheless, even under the "community caretaking" exception, a seizure must still be objectively reasonable and "an officer who happens to come across an individual's property in a public area c[an] seize it only if Fourth Amendment standards are satisfied."  *Soldal v. Cook Cty., Ill.*, 506 U.S. 56, 68 (1992).  In this case, whether or not the seizure of Plaintiff's backpack was a reasonable act in furtherance of public safety will depend on the emergent events unfolding at Black Lives Matter Plaza on June 23, 2020 and whether Plaintiff had abandoned his bag.  *See* Compl. ¶ 77.  These fact-bound inquiries are not suitable for disposition at the pleading stage, where the Court does not resolve factual disputes, but instead, accepts Plaintiff's well-pleaded allegations as true.  *See Bloem v. Unknown Dep't of the Interior Emps.*, 920 F. Supp. 2d 154, 162–63 (D.D.C. 2013).  As such, the

Court will permit Plaintiff's Fourth Amendment *Monell* claim to proceed past the motion to dismiss stage.

Plaintiff has also alleged a Fifth Amendment *Monell* claim against the District of Columbia that is at least sufficient to survive a motion to dismiss. *See* Compl. ¶¶ 108–15. First, Plaintiff alleges a property interest in his backpack, as well as the clothes, personal identification documents, and cash stored inside. *Id.* ¶ 89. Plaintiff then alleges that his backpack was confiscated by MPD and DPW officials in Black Lives Matter Plaza, *see id.* ¶¶ 82, 84, absent those officials providing Plaintiff any notice of the confiscation, *see id.* ¶ 74, or a meaningful opportunity to object to the confiscation or retrieve his property thereafter, *see id.* ¶¶ 81–87. Relatedly, Plaintiff alleges that the provision of some pre-deprivation notice or a post-deprivation retrieval procedure would have reduced the risk of an erroneous property deprivation, such as the one Plaintiff allegedly experienced here. *See* Compl. ¶¶ 56–57, 86; *Mathews v. Eldridge*, 424 U.S. 319, 343 (1976). At the motion to dismiss stage, this alleged confiscation of personal property by the District of Columbia, absent any notice or a hearing, plausibly states a *Monell* claim for a Fifth Amendment procedural due process violation. *See, e.g.*, *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1265 (D.C. Cir. 2020) (explaining that procedural due process demands "at minimum, the basic requirements of notice and an opportunity to be heard"); *Proctor v. District of Columbia*, No. 1:18-CV-00701 (TNM), 2018 WL 6181739, at *4 (D.D.C. Nov. 27, 2018) (denying motion to dismiss procedural due process claim involving the confiscation of allegedly unattended property).

In response, the Moving Defendants argue that Plaintiff's procedural due process claim fails because state tort law provides Plaintiff with an adequate post-deprivation remedy. *See* Defs.' Mot. at 10. The Moving Defendants are correct that "[w]here procedures exist under state law that 'could have fully compensated the [plaintiff] for the property loss he suffered,' and the property

loss is a result of 'random, unauthorized' conduct not sanctioned by state law, there is no procedural

due process claim under section 1983." *Avila v. Dailey*, 246 F. Supp. 3d 347, 361 (D.D.C. 2017)

(quoting *Parratt v. Taylor*, 451 U.S. 527, 544 (1981)).  This exception, however, applies where

"post-deprivation tort remedies are all the process that is due, simply because they are the only

remedies the State could be expected to provide." *Zinermon v. Burch*, 494 U.S. 113, 132 (1990).

At the pleading stage, the Court is not persuaded that a post-deprivation tort claim is all the

process the was owed to Plaintiff.  First, Plaintiff's deprivation, at least as alleged, did not arise

from a "random and unpredictable" occurrence, but rather from an encampment removal operation

authorized by the District of Columbia.  *Id.*  Moreover, it remains unclear at the motion to dismiss

stage whether a state law tort remedy would adequately redress Plaintiff's alleged injuries.  *See,*

*e.g.*, Compl. ¶¶ 91–96; Pl.'s Reply at 21.  Accordingly, the Court declines to dismiss Plaintiff's

procedural due process claim at this time, on the basis of Plaintiff's potential access to a post-

deprivation tort remedy.  *See Zinermon*, 494 U.S. at 127 ("Due process . . . is a flexible concept

that varies with the particular situation.").

## 2.  Counts III, IV, and V – Common Law Claims

This leaves only Plaintiff's common law tort claims in Counts III, IV, and V.  The Court

reiterates that Plaintiff's complaint names each Defendant in their official capacity.  *See* Compl.

¶¶ 19–26.  As such, Plaintiff's common law tort claims in Counts III, IV, and V also stand as

*official capacity* claims, and "a tort action brought against city officials in their official capacities

is equivalent to an action against the city itself." *Robinson v. District of Columbia*, 403 F. Supp.

2d 39, 49 (D.D.C. 2005); *see also Price v. District of Columbia*, 545 F. Supp. 2d 89, 95 (D.D.C.

2008).  In their briefing, no Defendant has presented a freestanding argument for the dismissal of

these official capacity claims in Counts III, IV, and V, properly characterized as claims against the

District of Columbia.[4]  Consequently, the Court will not dismiss Plaintiff's official capacity claims in Counts III, IV, and V, at this time.

## IV.    CONCLUSION

For the reasons set forth herein, the Court will **GRANT IN PART** and **DENY IN PART** the Moving Defendants' Motion.  Specifically, the Court will **GRANT** the Moving Defendants' Motion, to the extent it seeks dismissal of Counts I through V against each of the Moving Defendants in their *individual* capacities.  The Court also **DISMISSES** all of Plaintiff's Fourteenth Amendment claims.  The Court, however, will **DENY WITHOUT PREJUDICE** the Moving Defendants' Motion, to the extent it seeks dismissal of Plaintiff's *official* capacity claims against the Moving Defendants.  An appropriate Order will accompany this Memorandum Opinion.

**Date**: April 22, 2021

_____
/s/
COLLEEN KOLLAR-KOTELLY
United States District Judge

---

[4] Defendants did argue that this Court should exercise its discretion and dismiss any common law claims against the District of Columbia for lack of supplemental jurisdiction.  *See* Mot. to Dismiss, ECF No. 9, at 14–15.  This argument, however, presupposes the Court's dismissal of Plaintiff's constitutional claims. Because some of Plaintiff's constitutional claims remain, the Court will not dismiss any of Plaintiff's common law claims for want of supplemental jurisdiction, a matter left to this Court's discretion.  *See* 28 U.S.C. § 1367(c).